**PHILIP MORRIS USA INC., Plaintiff,**

v.

**William W. LEE et al., Defendants.**

**No. EP–05–CV–490–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

July 2, 2007.

Bruce A. Koehler, Carl H. Green, Mounce, Green, Myers, Safi, Paxson & Galatzan, P.C., El Paso, TX, John C. Ulin, Los Angeles, CA, Kalai Lau, Samuel R. Watkins, Heller Ehrman LLP, Seattle, WA, for Plaintiff.

Robert A. Skipworth, Attorney at Law, El Paso, TX, for Defendants.

Julian O. Balea, Aventura, FL, pro se.

Synergy Trading Group, Inc., Aventura, FL, pro se.

Felipe Castaneda, El Paso, TX, pro se.

Ronald F. Morrison, El Paso, TX, pro se.

### ORDER GRANTING PLAINTIFF'S MOTION TO RECONSIDER ORDER GRANTING MOTION TO DISMISS SOUTHEASTERN CARGO SERVICES, INC. AND JOHN TOMINELLI FOR LACK OF PERSONAL JURISDICTION

MARTINEZ, District Judge.

On December 28, 2006, the Court entered an order granting the motion to dismiss for lack of personal jurisdiction filed by Defendants Southeastern Cargo Services, Inc. ("Southeastern") and John Tominelli (collectively "Defendants"). On January 12, 2007, Plaintiff Philip Morris USA Inc. filed the instant "Motion to Reconsider Order Granting Motion to Dismiss for Lack of Personal Jurisdiction by Southeastern Cargo Services, Inc. and John Tominelli."[1] Therein, Plaintiff asks the Court to revisit its original order dismissing Defendants, contending that newly discovered evidence establishes a basis for the Court's jurisdiction. After due consideration, the Court is of the opinion that Plaintiff's Motion to Reconsider should be granted and Defendants reinstated to this cause for the reasons set forth below.

## I. LEGAL STANDARD FOR PERSONAL JURISDICTION

When a defendant challenges personal jurisdiction, the plaintiff has the burden of establishing that jurisdiction exists. *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 204 (5th Cir. 1996). When, as here, a federal district court does not hold an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction. *Cent. Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir.2003). While the parties have presented conflicting affidavits and argued over the various inferences that the Court should draw from particular facts, the Court must accept as true Plaintiff's "uncontroverted allegations, and resolve in its favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir.2000). The Court must also draw

---

**1.** In addition to Plaintiff's Motion to Reconsider, the Court has considered (1) Defendants' "Response in Opposition to Plaintiff's Motion for Reconsideration of Order Granting Defendant's Motion to Dismiss," filed on March 5, 2007; (2) Plaintiff's "Reply in Support of Motion to Reconsider Order Granting Motion to Dismiss for Lack of Personal Jurisdiction by Southeastern Cargo Services, Inc. and John Tominelli," filed on April 3, 2007; (3) Defendants' "Sur-reply to Plaintiff's Reply in Support of Motion to Reconsider Order Granting Motion to Dismiss for Lack of Personal Jurisdiction by Southeastern Cargo Services, Inc. and John Tominelli," filed on April 26, 2007; and (4) Plaintiff's "Rebuttal to John Tominelli and Southeastern Cargo Services, Inc.'s Sur-reply to Plaintiff's Motion to Reconsider Order Granting Motion to Dismiss for Lack of Personal Jurisdiction," filed on May 22, 2007. The Court has also reviewed Defendants' original "Motion to Dismiss for Lack of Personal Jurisdiction and Brief in Support," filed on June 15, 2006, and the other submissions filed by the parties in connection with that motion.

"all reasonable inferences from the facts thus established" in favor of Plaintiff. *Felch v. Transportes Lar–Mex SA DE CV,* 92 F.3d 320, 327 (5th Cir.1996). In resolving such conflicts in favor of Plaintiff for the purpose of resolving whether personal jurisdiction exists, the Court need not engage in a weighing of the evidence as it would when addressing the merits of Plaintiff's claims.

A federal district court sitting in Texas may exercise jurisdiction over a nonresident defendant only to the extent permitted by the Texas long-arm statute and federal due process. *Gundle Lining Constr. Corp.,* 85 F.3d at 204. "[T]he Texas long-arm statute has been interpreted to extend to the limits of due process...." *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir.1986). Accordingly, a federal district court sitting in Texas need only consider whether the exercise of jurisdiction comports with the requirements of federal due process. *Id.*

 The exercise of jurisdiction over a defendant is constitutionally sound when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.'" *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir.1999) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Minimum contacts may give rise to general or specific jurisdiction. When a nonresident defendant has "continuous and systematic general business contacts" with the forum state, a court has general jurisdiction over any suit brought against the defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). If the defendant's contacts do not satisfy general jurisdiction, a court may nonetheless exercise specific jurisdiction over "a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 414 n. 8, 104 S.Ct. 1868.

The Fifth Circuit has consolidated the inquiry into whether the exercise of personal jurisdiction is consistent with due process by adopting the following three-prong test:

(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposefully directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Nuovo Pignone, SpA v. Storman Asia M/V,* 310 F.3d 374, 378 (5th Cir.2002).

## II. DEFENDANTS' MOTION TO DISMISS

On June 15, 2006, Defendants filed a motion to dismiss, asserting that they lack the constitutionally requisite minimum contacts with Texas for the Court to exercise personal jurisdiction. Defs.' Mot. to Dismiss 1. Defendants argued in the alternative that Plaintiff's claims should be dismissed pursuant to Federal Rule of Civil Procedure 56, as "the Plaintiff cannot prove any facts according to which the trier of fact could find for the Plaintiff against the Defendants." *Id.*

> *A. The Evidence Before the Court When it Ruled on Defendants' Motion to Dismiss*

At the time the Court considered Defendants' motion, the evidence before the Court indicated the following: Plaintiff is a

Virginia corporation with its principal place of business in Virginia. Pl.'s Second Am. Compl. ¶ 14. Prior to its voluntary dissolution in 2003, Southeastern was a Florida corporation. *Id.* ¶ 23; Defs.' Mot. to Dismiss 3. Southeastern "specialized in providing logistics services to companies purchasing all manner of goods acquired in domestic and foreign markets." Defs.' Resp. to Pl.'s Mot. to Recons., Ex. A, Tominelli Aff. ¶ 2. Tominelli is an individual residing in Florida who at all relevant times served as the president of Southeastern. Pl.'s Second Am. Compl. ¶ 22; Defs.' Resp. to Pl.'s Mot. to Recons., Ex. A, Tominelli Aff. ¶ 1.[2]

On approximately August 10, 2003, Defendants contracted to hold in escrow certain funds to be paid by William Lee and his company, Kagro Company, Inc. ("Kagro"), to Synergy Trading Group, Inc. ("Synergy") (all three of whom are named defendants in this cause). Defs.' Mot. to Dismiss 4. Lee and Kagro are both Texas residents, while Synergy is a resident of Florida. Pl.'s Second Am. Compl. ¶¶ 15–16. At that time, Defendants were at least aware that the transaction involved the purchase of cigarettes located in Curaçao, an island territory of the Netherlands Antilles. Defs.' Mot. to Dismiss 4.

On August 25, 2003, Defendants received a wire transfer in the amount of $39,000 from Lee for deposit in an account Southeastern used for escrow (the "Special Account"). This transfer apparently constituted a down payment for the cigarettes. *Id.* at 5; Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 16. Defendants also agreed to inspect the cigarettes. Defs.' Mot. to Dismiss 4. On August 27, 2003, Tominelli traveled to Curaçao and conducted his inspection. *Id.* at 5; Pl.'s Resp. to Defs.' Mot. to

Dismiss ¶ 2. He then completed a report of the inspection and faxed it to Synergy. Defs.' Mot. to Dismiss 4; Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 2.

After the inspection, Tominelli wrote a check for $2,826.59 from the Special Account to Southeastern. Defs.' Mot. to Dismiss 4. Defendants initially claimed that this was the only benefit they received, and that it represented $2,000 for an inspection fee and $826.59 for reimbursement of Tominelli's travel expenses. *Id.* Lee then wired an additional $210,450 to Southeastern for deposit in the Special Account. *Id.,* Ex. A, Tominelli Aff. ¶ 22; Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 2. Plaintiff contends that Tominelli then made several disbursements from the Special Account: $30,168.50 to Ronald Morrison, a Texas resident; $28,208.50 to Synergy; $16,727 to Susumu Corporation; and $166,500 to Susumu Trading. Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 2. This allegedly left Defendants with a balance of $5,019.41, in addition to the amount they were paid for their contracted services in the transaction.

At that point, the cigarettes were shipped from Curaçao with an intended destination of El Paso, Texas. *Id.* ¶ 3. The cigarettes were seized in Houston and determined to be counterfeit Marlboros. *Id.* Plaintiff, the registered owner of the Marlboro and Marlboro Roof Design trademarks, Pl.'s Second Am. Compl. ¶ 6, then initiated the instant cause. Plaintiff claims that numerous defendants conspired "to import, distribute and sell ... massive shipments of counterfeit cigarettes" in violation of the Lanham Act, the Tariff Act, and Texas statutory and common law. *Id.* ¶¶ 1, 5.

---

**2.** While Tominelli indicates that Southeastern has been voluntary dissolved, the parties have effectively treated Tominelli and Southeastern as one entity for purposes of personal jurisdiction. The Court will continue to do so for purposes of this Order.

### B. The Court's Order Granting Defendants' Motion to Dismiss

On December 28, 2006, the Court granted Defendants' motion to dismiss on the grounds that Plaintiff "failed to demonstrate that Defendants had contacts with Texas of a quality sufficient to support a prima facie case of personal jurisdiction." Order Granting Mot. to Dismiss 11. The Court addressed general personal jurisdiction only in a footnote, as Plaintiff had not argued, and the evidence did not otherwise show, that Defendants' contacts with Texas rose to the level of general personal jurisdiction. *Id.* at 5 n. 1.

In finding a lack of specific personal jurisdiction, the Court held that Defendants had not purposefully availed themselves of the privilege of conducting activities in Texas. *Id.* at 5. The Court rejected Plaintiff's claim that Defendants' contractual involvement in the transaction at issue evinced sufficient contacts with the State of Texas. *Id.* at 6. The factual allegations before the Court indicated that Defendants' relationship was with Synergy, the Florida corporation that hired Defendants, and that Defendants were hired to provide escrow and inspection services for a transaction involving cigarettes were located in Curaçao. *Id.* The Court found it "merely fortuitous" that Defendants' involvement in the transaction benefitted a Texas resident and that the cigarettes were later shipped to Texas, as the evidence before the Court showed that Defendants only became aware that the cigarettes' purchaser, Lee, was a Texas resident after Defendants agreed to provide logistics services. *Id.* at 7. There was no evidence that Defendants had a relationship with any other parties to the transaction. The evidence before the Court also failed to support the conclusory supposition that Defendants' inspection went beyond the quality and quantity of the cigarettes and involved an attestation to their authenticity. The evidence before the Court thus did not support a finding of jurisdiction on the basis of Defendants' alleged complicity in a conspiracy directing counterfeit cigarettes into Texas. Without a basis for the exercise of general or specific personal jurisdiction, the Court granted Defendants' motion to dismiss.

### III. PLAINTIFF'S MOTION TO RECONSIDER

■ Plaintiff subsequently filed the instant Motion to Reconsider, contending that newly discovered evidence demonstrates the propriety of the Court's exercising both specific and general personal jurisdiction over Defendants. Pl.'s Mot. to Recons. 2. "While the Federal Rules of Civil Procedure do not provide for a motion for reconsideration, such a motion may be considered ... a Rule 60(b) motion for relief from judgment or order" when filed more than ten days after entry of the order.[3] *Shepherd v. Int'l Paper Co.,* 372 F.3d 326, 328 n. 1 (5th Cir.2004). Rule 60(b) provides that "[o]n motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding [when] ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)...." FED.R.CIV.P. 60(b). In its Motion to Reconsider, Plaintiff presents evidence that it indicates it received through discovery subsequent to filing its response to Defendants' motion to dismiss. While Defendants assert at one point that Plaintiff's Motion to Reconsider improperly invokes a new legal argument that could have been included in its opposition to the

---

**3.** The Court granted Defendants' motion to dismiss on December 28, 2006, and Plaintiff filed its Motion to Reconsider on January 12, 2007.

motion to dismiss, Defs.' Sur-reply in Opp'n to Pl.'s Mot. to Recons. 2, Defendants do not contest Plaintiff's assertion that the newly presented evidence is appropriately considered under Rule 60(b).

## IV. EXERCISING JURISDICTION IN LIGHT OF PLAINTIFF'S NEW EVIDENCE

### A. Defendants' Alleged Contacts with Texas

■ Plaintiff argues in its Motion to Reconsider that the Court may exercise specific personal jurisdiction over Defendants because Defendants engaged in tortious acts causing effects and consequences in Texas. Plaintiff contends that new evidence shows that Defendants were brought into the transaction by Motohiro Miyagi, the original seller of the counterfeit cigarettes and also a named defendant in this cause, with whom Defendants had a long-running business partnership, and that the payment received by Defendants far exceeds the fees paid for their inspection services. Pl.'s Mot. to Recons. 3. Plaintiff further argues that the evidence establishes that Defendants negotiated directly with Lee, a Texas resident, in agreeing to provide escrow and inspection services, and that Defendants did so knowing that the cigarettes would be shipped to Texas. Id. at 4–5. Plaintiff claims Defendants' inspection involved an assessment of the cigarettes' authenticity, and the inspection report prepared by Defendants falsely verified their authenticity in order to induce Lee's purchase. Pl.'s Reply in Supp. of Pl.'s Mot. to Recons. 4–6. Finally, Plaintiff contends that the exercise of general personal jurisdiction is also proper, as Defendants' significant amount of business with Texas residents in recent years rises to the level of continuous and systematic contacts. Pl.'s Mot. to Recons. 5–7. Plaintiff's allegations are supported by both direct and circumstantial evidence in the form of documentary exhibits and various affidavits. The Court will now review the factual allegations set forth in this new evidence.

### 1. Defendants Had a Preexisting Relationship with Miyagi

First, the new evidence presented by Plaintiff provides a larger context to Defendants' involvement with the other parties to the transaction underlying this cause. Plaintiff's new evidence shows that Defendants had an ongoing business relationship with Miyagi, the alleged original owner who sold the cigarettes to Texas resident Lee.[4] Through that relationship, Defendants frequently provided brokerage services for transactions in which Miyagi sold goods to parties within the United States. See, e.g., Pl.'s Mot. to Recons., Exs. 3–8 (correspondence from Miyagi to Tominelli discussing various shipments of cigarettes); Defs.' Resp. to Pl.'s Mot. to Recons. 4, 6–7, and Ex. A, Tominelli Aff. ¶ 14. While Defendants' role was typically limited to the type of logistics services they contend were provided in this trans-

---

**4.** The Court notes that Defendants' contacts with Miyagi do not directly involve Texas, and ultimately it is Defendants' contacts with Texas that are of concern in this analysis. The Court will not impute Miyagi's own contacts with Texas to Defendants. See Paolino v. Argyll Equities, L.L.C., 401 F.Supp.2d 712, 720 (W.D.Tex.2005) ("Although Plaintiff alleges that the Defendants engaged in a conspiracy, the Court must evaluate each Defendant's contacts separately to determine whether personal jurisdiction exists."). Defendants' contacts with Lee, the Texas resident who purchased the counterfeit cigarettes, are of primary concern to the Court. The Court looks to Defendants' relationship with Miyagi only insofar as the context of Defendants' involvement in this transaction allows the Court to assess the reasonableness of the inferences that Plaintiff asks the Court to draw regarding Defendants' relationship with Lee.

action, such as escrow and inspection services, Defendants also assisted their clients by connecting potential buyers and sellers. It is uncontested that Defendants' relationship with Miyagi involved prior transactions in which Defendants located a buyer for goods sold by Miyagi. *See* Pl.'s Mot. to Recons., Exs. 6–7; Defs.' Resp. to Pl.'s Mot. to Recons., Ex. A, Tominelli Aff. ¶¶ 14, 16. In at least one transaction, Defendants received approximately fifty percent of Miyagi's profit. Pl.'s Mot. to Recons., Exs. 6–7. Miyagi also allowed Defendants to keep an overpayment of $445. *Id.,* Ex. 8. This evidence supports an inference of an ongoing close relationship between the parties.

While Defendants' contractual agreement to provide logistics services in this transaction may have been with Synergy, a Florida corporation, the recently presented evidence also indicates that Defendants were originally recommended and brought into this transaction by Miyagi himself. *Id.,* Ex. 1, Balea Dep., 102:17–102:11 and 231:11–231:13. The Court does not find it reasonable to infer from this evidence alone that Defendants were knowing participants in an alleged scheme to sell counterfeit cigarettes to Lee. Taken together with other evidence, though, the Court believes that the evidence of Defendants' pre-existing relationship with Miyagi and frequent involvement in acting as a conduit between buyers and sellers, going beyond simply providing intermediary logistics services to pre-existing agreements, supports Plaintiff's argument suggesting that Defendants' involvement in the transaction at issue also went beyond inspection and escrow services. The Court turns now to Defendants' alleged role in the transaction.

*2. Defendants' Inspection of the Cigarettes Allegedly Assessed Authenticity*

Defendants' primary role in the transaction was ostensibly to inspect the ciga-

rettes and submit a report of the inspection to Lee. Evidence now shows that Miyagi traveled with Tominelli to Curaçao in order to inspect the cigarettes. Defs.' Resp. to Pl.'s Mot. to Recons., Ex. A, Tominelli Aff. ¶ 15. While there is some dispute as to whether Miyagi actually accompanied Tominelli to the inspection itself, correspondence from Balea combined with Miyagi's presence in Curaçao sets forth a factual dispute that must be resolved in favor of Miyagi's presence at the inspection. *See* Pl.'s Mot. to Recons., Ex. 2 (correspondence from Balea to Miyagi, dated August 19, 2003, in which Balea says "John [Tominelli] has agreed to go on Monday, August 25th, 2003 with you in Curaçao to inspect goods."). The scope of Tominelli's inspection allegedly involved an assessment of the cigarettes' authenticity. Pl.'s Reply in Supp. of Mot. to Recons., Ex. 20, Castaneda Dep., 31:23–32:4 (stating that Tominelli "was supposed to fly out there, check authenticity, check product, which he did in his report"); *id.,* Ex. 20, Castaneda Dep., 32:5–32:11 (Question: "Do you recall discussing with Mr. Morrison that John Tominelli was gonna inspect for the authenticity to the product?" Answer: "Why else would you hire an inspector?").

Tominelli subsequently prepared an inspection report and faxed it to Synergy for distribution to Lee in Texas. Defs.' Mot. to Dismiss, Ex. A, Tominelli Aff. ¶ 17; Pl.'s Reply in Supp. of Mot. to Recons., Ex. 22 (inspection report is directed "To: Kangro [sic] Inc.," and lists Lee's name and an address in El Paso). That report describes the quantity, packaging, and freshness of the cigarettes, and provides a "Description of goods," stating that the cigarettes were "MADE UNDER AUTHORITY OF PHILIP MORRIS PROD-

UCTS S.A. NEUCHATEL, SWITZER-LAND." Pl.'s Reply in Supp. of Mot. to Recons., Ex. 22.

In light of new evidence suggesting that Defendants assessed the cigarettes' authenticity, the Court believes that it is a reasonable reading of that report to infer that Tominelli was in fact attesting to the authenticity and indicating that the counterfeit cigarettes were in fact manufactured by Plaintiff. Combined with Miyagi's presence at the inspection and evidence suggesting that Defendants had represented themselves to an unrelated party as qualified to inspect cigarettes for authenticity, *see* Pl.'s Mot. to Recons., Ex. 15, Lopez Aff. ¶ 6, this evidence suggests that Defendants knowingly misrepresented the authenticity of the cigarettes and communicated this misrepresentation to Lee in their report.

### 3. Defendants Were Allegedly Paid More than the Amount Due for Their Escrow and Inspection Services

Defendants also served as an escrow agent for the transaction, receiving two payments totaling $249,450 from Lee and making disbursements totaling $241,604 to various interested parties, including companies run by Miyagi. Defs.' Mot. to Dismiss, Ex. A, Tominelli Aff. ¶ 22; Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 16. Defendants withdrew $2,826.59 in compensation for Tominelli's inspection and travel expenses. Defs.' Mot. to Dismiss 5; Pl.'s Resp. to Defs.' Mot. to Dismiss ¶ 19. This allegedly left Defendants with the remaining balance of $5,019.41. Rather than disburse this additional amount to the seller, Miyagi, Defendants kept the excess payment. Pl.'s Reply in Supp. of Mot. to Recons. 6. Plaintiff contends that this overpayment by Miyagi to Defendants was in recognition of Defendants' preparation of a

fraudulent inspection report. *Id.* at 7. Defendants, on the other hand, ask the Court to infer that the amount "was leftover as a result of an oversight on the part of Synergy." Defs.' Sur-reply in Opp'n to Pl.'s Mot. to Recons. 6. Again, the Court need not resolve the dispute between similarly plausible inferences for purposes of this analysis, and will instead view the evidence in the light most favorable to the exercise of jurisdiction. Defendants admit that in at least one previous transaction they had received a substantial payment from Miyagi in recognition of having gone beyond providing basic inspection services by actually connecting Miyagi with a new buyer. Defs.' Resp. to Pl.'s Mot. to Recons., Ex. A, Tominelli Aff. ¶¶ 14, 16. While there is no suggestion that Defendants brought Lee into this transaction, Defendants' overpayment does suggest that their involvement in this transaction was beyond the provision of mere inspection and escrow services.

### 4. Defendants Allegedly Negotiated Directly with Lee

While Defendants also contend that they had no direct communication with Lee beyond sending the inspection report to him, evidence now before the Court suggests otherwise. While Defendants' contractual relationship was apparently with Synergy, there is new evidence that Defendants did in fact communicate with Lee directly and that Defendants participated in negotiating the terms of their agreement. Plaintiff points to an invoice from Southeastern to "Kangro" [sic], dated August 30, 2003. *See* Pl.'s Mot. to Recons., Ex. 13. The invoice bills Kagro $2,000 for Tominelli's "inspection trip" and $826.50 for "travel expenses." *Id.*, Ex 13. A handwritten note, apparently signed by Morrison, another intermediary in the transaction, deletes the $826.50, and states that Lee called Morrison on August 26, 2003, to

"complain that he agreed with Mr. Tominelli to pay only $2000." *Id.,* Ex. 13. While Tominelli contends that he had no such conversation with Lee and denies that he agreed to deduct the $826.50, which in fact was subsequently paid, Defs.' Resp. to Pl.'s Mot. to Recons., Ex. A, Tominelli Aff. ¶ 20, this is another factual dispute which at this juncture must be resolved in Plaintiff's favor. Morrison stated in his deposition that Lee spoke with Tominelli when he contested the assessed amount of travel expenses. Pl.'s Reply in Supp. of Mot. to Recons., Ex. 39, Morrison Dep., 109:2–110:9. Therefore, Plaintiff has adequately supported the allegation that Defendants did negotiate with Lee, a Texas resident, about the terms of Defendants' involvement in the transaction.

### 5. Defendants Allegedly Knew that the Cigarettes Would be Shipped to Texas

Finally, there is some evidence, albeit tenuous, that Defendants were aware of the shipping destination of the cigarettes. Defendants do not dispute that they were aware that Lee was a Texas resident or that they received an invoice listing Lee's Texas address. While the shipping information on the invoice referred only to "Buyer's final destination," Defs.' Mot. to Dismiss, Ex. B, newly presented evidence suggests that Defendants were also aware the cigarettes would be sent to Texas. In Morrison's deposition, he testified that Felipe Castaneda, another intermediary in the transaction, had explained the plan to bring the cigarettes in through Houston, transit El Paso, and cross into Mexico. Pl.'s Reply in Supp. of Mot. to Recons., Ex. 39, Morrison Dep., 39:16–40:19. Morrison explained that Tominelli had subsequently informed Castaneda that this was illegal, as such cigarettes made outside the United States cannot transit through the

country. *Id.,* Ex. 39, Morrison Dep., 46:9–46:15. Balea testified in his own deposition that Tominelli called him for help convincing Castaneda, who was also on the line, that the cigarettes could not be sent into the United States. *Id.,* Ex. 1, Balea Dep., 55:16–56:3. Of course, this evidence could support Defendants' argument that they lacked knowledge of the cigarettes' counterfeit nature. But drawing all reasonable inferences in Plaintiff's favor, as the Court must do, the evidence arguably suggests that Defendants knew that the cigarettes were to be shipped into Texas, and undermines the contention they played no role in decisions regarding the cigarettes' shipment.

### 6. Summary of Defendants' Alleged Contacts

The evidence that each party has submitted to the Court ultimately presents a complex factual dispute. Were Defendants merely "incidental service providers," recruited by a former customer to provide basic services for a seemingly legitimate business transaction? Or were Defendants knowing and willing participants in a fraudulent transaction, assisting a long-time business associate with the sale and shipment of counterfeit goods? While Defendants have vigorously contested nearly each and every one of Plaintiff's allegations and challenged much of Plaintiff's evidence, the Court need not resolve these disputes. Plaintiff need only state a prima facie case for jurisdiction. Given evidence of Defendants' ongoing business relationship with Miyagi, the direct negotiations with Texas resident Lee, Tominelli's verification in his inspection report of the cigarettes' authenticity, the substantial amount of money Defendants received beyond the amount Lee paid for the inspection and escrow services, and Defendants' involvement in discussions regarding ship-

ping the cigarettes to Texas, the Court believes Plaintiff has presented sufficient evidence to allow the Court to conclude Defendants' involvement in the transaction went beyond that of a typical uninvolved intermediary services provider. Plaintiff has set forth a prima facie case that Defendants were involved in inducing Lee's purchase of the cigarettes, thereby deliberately directing their conduct toward a Texas resident.

### B. Defendants' Contacts are Sufficient for the Exercise of Jurisdiction

### 1. Specific Personal Jurisdiction

■ The Court may exercise specific personal jurisdiction over "a defendant in a suit arising out of or related to the defendant's contacts with" Texas. *Helicopteros Nacionales de Colombia, S.A.,* 466 U.S. at 414 n. 8, 104 S.Ct. 1868. "When a nonresident defendant commits a tort within the state, or an act outside the state that causes tortious injury within the state, that tortious conduct amounts to sufficient minimum contacts with the state" to warrant jurisdiction. *Guidry v. U.S. Tobacco Co.,* 188 F.3d 619, 628 (5th Cir.1999). "Even an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Id.* After considering Defendants' alleged contacts with Texas, the Court is of the opinion that Defendants' involvement in the transaction at issue, while consisting of acts performed outside of Texas, produced tortious consequences and effects in Texas, and that the causes of action raised in Plaintiff's complaint arise out of those contacts and effects.

In its Second Amended Complaint, Plaintiff alleges various causes of action stemming from the transaction, including claims of unlawful importation of goods bearing infringing and registered trademarks under the Lanham Act and the Tariff Act. Plaintiff does not merely allege that the effects of those torts were felt in Texas. *Cf. Panda Brandywine Corp. v. Potomac Elec. Power. Co.,* 253 F.3d 865, 870 (5th Cir.2001) (Subjecting a nonresident defendant to jurisdiction "for an intentional tort simply because the plaintiff's complaint alleged injury in Texas to Texas residents regardless of the defendant's contacts ... would completely vitiate the constitutional requirement of minimum contacts and purposeful availment."); *Allred v. Moore & Peterson,* 117 F.3d 278, 286 (5th Cir.1997) (The effects test "is not a substitute for a nonresident's minimum contacts that demonstrate purposeful availment of the benefits of the forum state."). Plaintiff has presented a prima facie case that Defendants were knowing and willing participants in the commission of these tortious acts by assisting the seller in executing a sale of counterfeit cigarettes and their subsequent shipment to Texas resident Lee.

In its order granting Defendants' motion to dismiss, the Court stressed that Plaintiff had presented insufficient evidence suggesting it was foreseeable to Defendants that the cigarettes would be shipped to Texas. While the Court had been presented with an invoice demonstrating Defendants' knowledge that Kagro was located in Texas, simply doing business with a Texas resident, standing alone, does not constitute minimum contacts necessary for the exercise of personal jurisdiction. *Holt Oil & Gas Corp.,* 801 F.2d at 778. The Court thus found that Defendants' contacts with Texas were " 'fortuitous, not deliberate, *de minimis,* not substantial.' " Order Granting Mot. to Dismiss 11 (quoting *Miss. Interstate Express, Inc. v. Transpo,*

*Inc.,* 681 F.2d 1003, 1006 (5th Cir.1982)). The newly presented evidence, both direct and circumstantial, gives the Court reason to revisit that conclusion and determine that Defendants' contacts were in fact both deliberate and substantial.

First, the evidence suggests that Defendants deliberately directed their contact toward Texas. The Fifth Circuit has indicated that jurisdiction will not exist if it was only foreseeable that Defendants' acts would cause effects in Texas. Jurisdiction requires that " 'it was somewhat more than merely foreseeable that the defendant's act would cause the particular effect in the state.' " *Guidry,* 188 F.3d at 629 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 37 (1971)). As discussed above, Plaintiff has presented a prima facie case that Defendants knew the cigarettes were to be sent to Texas, and knowingly participated in the transaction by taking actions to induce Lee's purchase of the cigarettes. They allegedly communicated directly with Lee, negotiating the terms of their agreement to inspect the cigarettes, and prepared an inspection report that was directed to him at his Texas address. The cigarettes, bearing false trademarks, were subsequently imported into Texas.

Second, Plaintiff has presented evidence showing that Defendants' contacts were substantial. Defendants' contacts with Texas were allegedly directed at inducing Lee's purchase of the cigarettes, thereby directing tortious activities and tortious goods into the State of Texas. While Defendants' contractual relationship was formed in Florida and all activities were performed in Florida and Curaçao, the effects caused in Texas were nonetheless substantial enough to cause tortious effects in Texas. *See Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 211 (5th Cir.1999) ("Even if the parties formed their relationship in Germany, however, a single act by Brandt directed toward Texas that gives rise to a cause of action by Wien Air can support a finding of minimum contacts."). The cigarettes were shipped to El Paso and ultimately seized at the Port of Houston, effects allegedly made possible by Defendants' conduct.

Allowing for jurisdiction over Defendants will not, as Defendants contend, lead to the exercise of jurisdiction over all logistics intermediaries in the destination forum of all consumer goods, whether the destination was known to the intermediary or not. A plaintiff must still present evidence suggesting that the intermediary was in a similar position to that of the ultimate seller, exercising some control over the destination of the goods and some awareness of their destination. In this cause, Plaintiff has presented a prima facie case that Defendants partnered with Miyagi to induce Lee's purchase of the counterfeit goods, thus distinguishing them from unknowing intermediaries exercising no real authority over a transaction. A knowing and willing participant in a plan to sell counterfeit goods to a Texas resident "should reasonably anticipate being haled into court" in Texas. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). For these reasons, the Court is of the opinion that Defendants' contacts with Texas are sufficient to constitute the minimum contacts necessary for the Court's exercise of specific personal jurisdiction.

### 2. General Personal Jurisdiction

Since the Court finds that Defendants' contacts are sufficient for the exercise of specific personal jurisdiction, the Court need not consider Plaintiff's alternative argument that the Court may exercise general personal jurisdiction over Defendants

due to their continuous and systematic contacts with Texas.

### C. Fair Play and Substantial Justice

■ The next step in the Court's analysis is "to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotation omitted). The burden to demonstrate that the assertion of jurisdiction would be unfair belongs to Defendants. *Wien Air Alaska, Inc.,* 195 F.3d at 215. The assertion of jurisdiction will only rarely be found to be unfair once minimum contacts are established. *Id.* Because Defendants have purposefully established minimum contacts with the State of Texas, they "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174. In considering Defendants' argument, the Court must consider and balance "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 421 (5th Cir.1993)

■ The Court sees no reason why exercising jurisdiction over Defendants would be unreasonable. In their original motion to dismiss, Defendants contended that the Court's exercise of jurisdiction would be unreasonable absent evidence that Defendants were part of a conspiracy to import the cigarettes, as Defendants would be required to travel to Texas to defend the lawsuit. Def.'s Reply in Support of Mot. to Dismiss 5. Defendants also argue that dismissal of Plaintiff's complaint against Defendants would not prejudice Plaintiff. *Id.*

Having already addressed the existence of contacts between Defendants and Texas and the prima facie case of Defendants' involvement in the transaction at issue, the Court also believes that the burden of defending this lawsuit in Texas is not so extraordinary as to render jurisdiction over Defendants unconstitutional. The inconvenience of litigating in a foreign state is by no means extraordinary in the federal courts, and Defendants fail to identify any facts which distinguish this case from the norm.

Additionally, the forum state of Texas has a significant interest in this matter, since counterfeit products were imported into the state to a Texas resident for possible resale to consumers within the state. *See Ruston Gas Turbines, Inc.,* 9 F.3d at 421 ("Texas, as a forum state, also has an interest in adjudicating a dispute that involves a sale of goods to a Texas consumer. . . ."). It is significant that none of the tortious effects giving rise to this suit occurred in Florida, the state of Defendants' residence.

Finally, while litigation in Florida may be more convenient for Defendants, this is not so compelling as to outweigh the interests of Plaintiff and the interstate judicial system. Defendants are not entitled to litigation in the forum of their choice, or the forum most convenient to their interests. *Burger King Corp.,* 471 U.S. at 484, 105 S.Ct. 2174. Given the large number of defendants in this suit, the most efficient resolution of Plaintiff's claims would be in Texas, where most defendants will be subject to jurisdiction. *See ICEE Distribs., Inc. v. J & J Snack Foods Corp.,* 325 F.3d 586, 594 (5th Cir.2003) ("[A]s a matter of judicial economy, the best place for resolution of the issues presented is in this suit, where claims against the three allegedly

offending parties ... can be resolved together...."). For these reasons, the Court is of the opinion that Defendants have failed to identify compelling circumstances that would render the Court's exercise of jurisdiction unreasonable. The Court thus concludes that its exercise of jurisdiction over Defendants does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co.,* 326 U.S. at 316, 66 S.Ct. 154.

## V. ATTORNEY'S FEES

In their response to Plaintiff's Motion to Reconsider, Defendants request attorney's fees in recognition of their being forced to respond to arguments "so lacking in factual or legal merit they amount to an abuse of legal processes that cries out for the Court to send a clear message that frivolous motions which drain judicial resources and result in necessary litigation expenses will be sanctioned." Defs.' Resp. to Pl.'s Mot. to Recons. 30–31. Having determined that Plaintiff's Motion to Reconsider is meritorious, the Court denies Defendants' request.

## VI. SUMMARY JUDGMENT

In their original motion to dismiss, Defendants argued in the alternative that the Court should dismiss the claims against Defendants pursuant to Federal Rule of Civil Procedure 56. Since the Court determined at that time that it had no jurisdiction to proceed against Defendants, it did not consider the issue of summary judgment. The parties have not addressed the issue in their submissions in connection with Plaintiff's Motion to Reconsider. Given the substantial amount of documentary evidence that has been presented to the Court since Defendants' filed their original motion to dismiss, the Court will not now attempt to address this issue without the benefit of further argument by the parties and instead will dismiss Defendants' request without prejudice. Should Defendants wish to file a subsequent motion for summary judgment, the Court will address the issue at that time.

## VII. CONCLUSION

Considering the additional evidence Plaintiff has presented, the Court is of the opinion that Plaintiff has met its burden and adequately alleged a prima facie case that Defendants had contacts with Texas of a quality sufficient for the exercise of specific personal jurisdiction, and that the Court's exercise of jurisdiction over Defendants satisfies the requirements of due process. As a consequence, the Court is compelled to grant Plaintiff's Motion to Reconsider its dismissal of Defendants pursuant to Federal Rule of Civil Procedure 12(b)(2), and to reinstate Defendants to this cause.

Accordingly, **IT IS ORDERED** that Plaintiff Philip Morris USA Inc.'s "Motion to Reconsider Order Granting Motion to Dismiss for Lack of Personal Jurisdiction by Southeastern Cargo Services, Inc. and John Tominelli" (Docket No. 117) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Court's "Order Granting Defendants Southeastern Cargo Services, Inc. and John Tominelli's Motion to Dismiss for Lack of Personal Jurisdiction" (Docket No. 104) is **VACATED.**

**IT IS FURTHER ORDERED** that Defendants Southeastern Cargo Services, Inc. and John Tominelli's "Motion to Dismiss for Lack of Jurisdiction" (Docket No. 50) is **DENIED.**

**IT IS FINALLY ORDERED** that Defendants Southeastern Cargo Services, Inc. and John Tominelli, as well as any and all claims raised against them in Plaintiff's

Second Amended Complaint, are **REIN-STATED** to the above-captioned cause.