IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 98-11141

---

WIEN AIR ALASKA, INC.

Plaintiff-Appellant

versus

GERALD I. BRANDT

Defendant-Appellee

---

Appeal from the United States District Court
For the Northern District of Texas

---

November 5, 1999

Before REAVLEY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

In this diversity case, we consider whether a foreign defendant's contacts with Texas are sufficient to confer personal jurisdiction under the Due Process Clause. Because we find sufficient minimum contacts exist and the assertion of jurisdiction would not be unfair or unreasonable, we REVERSE the district court's dismissal and REMAND for further proceedings consistent with this opinion.

I.

Wien Air Alaska, Inc. (Wien Air) is an Alaskan corporation

based in Texas, whose sole shareholder is Thor Tjontveit. Gerald I. Brandt is a citizen of the Federal Republic of Germany who provided his services as an attorney for Wien Air from approximately August 1989 to April 1991. Brandt originally visited Texas in 1989 to help Tjontveit acquire Wien Air, then conducted most of his business with Wien Air through foreign meetings, correspondence and communications to Texas, and a final set of meetings in Texas in April 1991.

Wien Air was in the business of leasing U.S. aircraft and planned to expand into Eastern Europe. Brandt helped Wien Air develop this plan. On September 29, 1990, Wien Air authorized Brandt to form two German companies to maintain airport facilities in Germany. Late that year, Wien Air learned that Brandt's law partner, Hubertus Kestler, represented another airline company, GAC Trans-Air Carrier Lease GmbH Flugzeugleasing (GAC) and its sole shareholder Stephan Grzimek. Kestler was developing a plan for GAC that competed with Wien Air's plans.

Brandt told Wien Air that he represented only Wien Air's interests and suggested that Wien Air might be able to purchase GAC because of GAC's financial problems, provided Wien Air sold GAC some airplanes first. Tjontveit proposed to buy GAC and Brandt told Tjontveit on January 3, 1991 that GAC would accept Tjontveit's offer if Tjontveit would pay $1.3 million earnest money to Brandt, toward the full price of 5 million deutsche marks (DM). Acceptances of this offer were exchanged during February and March 1991.

At the same time, Brandt arranged for Wien Air to purchase a

2

25% stake in Flugservice Berlin (FSB), a company owned by the former East German Airlines. On February 25, 1991, in Germany, a document was prepared, signed, and notarized, which supposedly created a new company, Neue Flugservice und Development Berlin GmbH (NFSB), as a holding company for the FSB purchase. Stock in NFSB was never turned over to Wien Air. Only in October of 1993 was it discovered by Ms. Long, an employee of Wien Air, that Brandt owned the FSB stock himself and had acquired the interest March 1, 1991.

Tjontveit met Brandt in Germany on March 11, 1991 to close Wien Air's purchase of GAC and Wien Air's sale of aircraft to GAC, but GAC stock was not delivered and the transaction did not close. Brandt's law partner Kestler, however, allegedly withdrew DM 5 million from Wien Air's bank in Germany that day without Tjontveit's knowledge or permission, using a power of attorney given to Kestler by Wien Air at Brandt's request.

Brandt prepared a new document, confirming the GAC deal, signed by GAC, notarized by Ms. Long, which set a new closing date for the sale: March 26, 1991. Later, Brandt would tell Wien Air that this document was unenforceable under German law because it was not notarized by a German notary. At that time, Brandt told Tjontveit to go to Iceland on March 25, 1991 to close the GAC transaction. Tjontveit went there, but neither Brandt nor GAC appeared. Brandt called and said closing would occur instead in mid-April 1991. On March 28, 1991 and April 2, 1991, Brandt wrote Tjontveit in Texas promising that all transactions would be completed as intended.

3

On April 6, 1991, Tjontveit terminated Brandt's services for himself and Wien Air, and on April 10, 1991, Tjontveit told Brandt that Wien Air had retained another lawyer as counsel and warned Brandt not to transfer or vote shares of FSB. Tjontveit then asked Brandt to return Wien Air's power of attorney and to take no further actions until instructed. Tjontveit stated, however, that he was not terminating Brandt as an attorney, but wanted to continue the relation once the GAC situation was resolved.

The GAC deal did not close on April 15, 1991. The next day, Brandt called Tjontveit in Texas to again promise that the GAC deal would close. Brandt said he would come to Texas to close all outstanding matters on April 21 and 22, 1991.

Meetings in Texas on April 21 and 22 occurred with both Brandt and Tjontveit present. At these meetings, Brandt stated the following: (1) Brandt would complete the German registration process for the two Wien Air subsidiaries; (2) FSB stock belonged to Wien Air, but Brandt held it in trust for Wien Air; (3) Brandt would return all of Wien Air's documents and all valuable personal property of Tjontveit; (4) Brandt would go back to Germany and determine the status of FSB and report back to Wien Air; and (5) Brandt was still acting as Wien Air's attorney.

Brandt did not disclose that he had appropriated the interest in FSB to himself or explain what had happened to the DM 5 million Kestler had taken. Brandt then demanded DM 1.3 million for past services. Wien Air agreed to pay this based on the above promises and representations, signing a document in German allowing Brandt

4

to withdraw the money from a Wien Air account in Germany.

Finally, on May 9, 1991, in New York, Brandt announced the GAC deal would not close and GAC stock would not be delivered. He explained that the document evidencing that deal was not binding because it had not been notarized by a German notary. Brandt said he did not represent Wien Air or Tjontveit, but only represented GAC.

Wien Air brought suit in Texas state court alleging fraud, fraudulent inducement, and breach of contract and fiduciary duties. The case was removed to federal court. Brandt sought dismissal asserting lack of personal jurisdiction and forum non conveniens. The district court did not hold an evidentiary hearing but based its decisions on the affidavits and pleadings of the parties. The court granted dismissal, holding that Wien Air was unable to make a prima facie showing that the defendant had the necessary minimum contacts with Texas to support specific jurisdiction. We REVERSE the dismissal because we find that the defendant's contacts with Texas suffice to show the requisite minimum contacts and that the assertion would not be unfair or unreasonable. The issue of forum non conveniens was not raised on appeal and we do not consider it.


II.

Wien Air seeks to establish jurisdiction over Brandt under the Texas long arm statute, which Texas construes to extend to the limits of due process. See Schlobohm v. Schapiro, 784 SW.2d 355,

5

357 (Tex. 1990); Wilson v. Belin, 20 F.3d 644, 647 (5th Cir. 1994). Obtaining personal jurisdiction over a non-resident of a state is constitutionally permissible if the nonresident "purposefully availed himself of the benefits and protections" of Texas by establishing "minimum contacts" with Texas such that the defendant could "reasonably anticipate[] being haled into court in the forum state" and the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 777 (5th Cir. 1987); Wilson, 20 F.3d at 647.

At issue is whether Brandt's contacts with Texas are sufficient to support an assertion of personal jurisdiction. Because the district court did not hold an evidentiary hearing on the issue of jurisdiction, Wien Air need only establish a prima facie case. See Wilson, 20 F.3d at 648. Where the facts are not in dispute, the review of the district court's determination of personal jurisdiction is de novo. Id. at 647-48. Where facts are disputed, the plaintiff presenting a prima facie case is entitled to have the conflicts resolved in his favor. See Bullion v. Gillespie, 895 F.2d 213, 216-17 (5th Cir. 1990); Felch v. Transportes Lar-Mex SA De CV, 92 F.3d 320, 327 (5th Cir. 1996). The district court concluded that while Brandt "had contact with Wien Air in Texas on several occasions, those contacts related to and developed out of an ongoing relationship between the parties established in Germany and do not establish that Brandt purposefully availed himself of the benefits and protections of

6

Texas law." Even if the parties formed their relationship in Germany, however, a single act by Brandt directed toward Texas that gives rise to a cause of action by Wien Air can support a finding of minimum contacts. See Calder v. Jones, 465 U.S. 783 (1984); Ruston Gas Turbines, Inc. v. Donaldson Co., 9 F.3d 415, 419 (5th Cir. 1993).

In Calder minimum contacts were found when a journalist wrote a defamatory article in Florida which he knew would affect the plaintiff's reputation in California. The Court specifically found that the defendant had "expressly aimed" the tort at California. Id. at 789. The defendants in Calder analogized themselves to a welder who works on a boiler in Florida which later explodes in California. The defendants argued that jurisdiction over the welder would not be proper (even if allowable over the manufacturer) because the welder did not control where the manufacturer sold the boiler and the welder "derive[d] no direct benefit" from such distant sales. Id. The Court rejected this analogy based on the fact that the defendants were charged with intentional, tortious conduct directed toward the forum state. In those circumstances, the defendants must "'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." Id. at 790, 789-90.

This test applies outside the context of defamation, see Allred v. Peterson, 117 F.3d 278, 286-287 (5th Cir. 1997), although it has been remarked that the effects of defamation are more obviously felt in a foreign forum than the effects of other

intentional torts.  Id. at 287 (citing Wallace v. Herron, 778 F.2d 391, 395 (7th Cir. 1985)).  The foreseeable effects of a tort "are to be assessed as part of the analysis of the defendant's relevant contacts with the forum."  Id. (quoting Wallace, 778 F.2d at 395 (emphasis added)).  Foreseeable injury alone is not sufficient to confer specific jurisdiction, absent the direction of specific acts toward the forum.  See, e.g., Jobe v. ATR Marketing, Inc., 87 F.3d 751, 753-54 (5th Cir. 1996); Southmark Corp. v. Life Investors, Inc., 851 F.2d 763 (5th Cir. 1988).

According to the plaintiff's allegations, however, Brandt performed several tortious actions outside of Texas directed towards Wien Air in Texas.  These actions had foreseeable effects in the forum and were directed at the forum.  These contacts take the form of letters, faxes, and phone calls to Texas by Brandt whose contents contained fraudulent misrepresentations and promises and whose contents failed to disclose material information.

For example, Wien Air provides a sworn affidavit from its employee Ms. Long stating that numerous calls, letters and faxes were made by Brandt to Wien Air in Texas, and she avers that these calls contained the promises, assurances, and representations that are at the heart of the lawsuit.  In her words, "Mr. Brandt told me by phone to Texas that the delivery of the GAC stock would occur on March 11, 1991." She also stated that

> [t]here were several times between late 1990 and late 1991 when Mr. Brandt called me either at my home in Texas or at the office in Texas, regarding these transactions. He called many times between late February, 1991 through April, 1991 and reassured me that a deal had been consummated, that the GAC would be delivered to Wien Air,

8

and that the aircraft purchases would all close.

Brandt also performed services through these communications. For example, Long states that Brandt sent by fax a copy of a Notary Act he prepared, notarized by Kestler, which supposedly "constituted acceptance of an offer Mr. Tjontveit had made to buy 100 percent of the GAC stock from Mr. Grzimek" according to Brandt.

Another example provided by Wien Air is a letter sent from Brandt to Texas, dated April 2, 1991, in which Brandt states, with respect to the GAC deal: "You know, I'm always helping you where I can. Also in this special matter, we will find a solution, which will satisfy you. This I promised you." In another letter to Texas, dated March 28, 1991, Brandt states: "Mr. Grzimek couldn't reach you by phone and so he beg[g]ed me to confirm, that all pending contracts between you and Wien Air Alaska and him and GAC are valid and will be fulfil[l]ed by him and GAC, when both parties fulfil[l] their obligations."

Brandt disputes the number and content of the communications between Brandt and Wien Air in Texas. Brandt claims, for example, that there were few or no calls, and even if there were any, there is no evidence that their content related to or gave rise to any cause of action. At this stage, however, any conflict between the plaintiff and defendant with respect to the content and existence of these communications must be construed in favor of Wien Air. As such, the prima facie evidence indicates that Brandt directed affirmative misrepresentations and omissions to the plaintiff in Texas.

9

The defendant argues that communications directed into a forum standing alone are insufficient to support a finding of minimum contacts. See, e.g., Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 (5th Cir. 1987); Patterson v. Dietz, Inc., 764 F.2d 1145, 1147 (5th Cir. 1985); Nationwide Mutual Ins. v. Tryg International Ins., 91 F.3d 790, 796 (6th Cir. 1996); Reynolds v. International Amateur Athletic Fed., 23 F.3d 1110, 1116 (6th Cir. 1994); FDIC v. Malmo, 939 F.2d 535 (8th Cir. 1991); Austad Co. v. Pennie & Edmonds, 823 F.2d 223 (8th Cir. 1987). Cf. Allred v. Moore & Peterson, 117 F.3d 278 (5th Cir. 1997) (service of process on plaintiff in forum insufficient to support personal jurisdiction in abuse of prosecution claim).

In all of these cases, however, the communications with the forum did not actually give rise to a cause of action. Instead, the communications merely solicited business from the forum, negotiated a contract, formed an initial attorney-client relationship, or involved services not alleged to form the basis of the complaint. These cases are thus distinguishable from the present case. When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment. The defendant is purposefully availing himself of "the privilege of causing a consequence" in Texas. Cf. Serras v. First Tennessee Bank National Ass'n., 875 F.2d 1212 (6th Cir. 1989). It is of no use to say that the plaintiff "fortuitously" resided in Texas. See Holt Oil, 801 F.2d at 778. If this argument were valid in the tort context, the

10

defendant could mail a bomb to a person in Texas but claim Texas had no jurisdiction because it was fortuitous that the victim's zip code was in Texas. It may have been fortuitous, but the tortious nature of the directed activity constitutes purposeful availment.

Of course, when a lawyer chooses to represent a client in another forum, that in itself does not confer personal jurisdiction if the claim does not arise from the lawyer's contacts with the forum. See Austad, 823 F.2d at 226. However, when the claim arises from a breach of fiduciary duty based on a failure to disclose material information, the fact that the lawyer continually communicated with the forum while steadfastly failing to disclose material information shows the purposeful direction of material omissions to the forum state. Cf. Diamond Mortgage Corp. v. Sugar, 913 F.2d 1233 (7th Cir. 1990). In Diamond Mortgage, attorneys failed to disclose conflicts of interests at the time in which they rendered some of their services within the state of Illinois, which the Seventh Circuit found sufficient for "arising under" jurisdiction under a state long-arm statute. Id. at 1245-46. The court also found the assertion of jurisdiction was constitutional under the Due Process Clause. See id. at 1247. The services were performed not only by visits to the forum, but also by letters and phone calls. Furthermore, the court noted that "the precise number of physical visits to Illinois . . . may be irrelevant," because "'it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for

11

physical presence within a State in which business is conducted.'" Id. (quoting Burger King, 471 U.S. at 476) (emphasis added). Cf. Serras, 875 F.2d at 1218 (rejecting in dictum as "feeble" the defendant's argument that "if it had a duty to disclose . . . , that duty could have been performed anywhere so that any failure to perform shouldn't be held to establish a Michigan contact," at least when the plaintiff had also alleged affirmative acts of misrepresentation in Michigan).

In addition to the communications Brandt directed into Texas from outside of Texas, Brandt also visited Texas during 1989 at which time he allegedly gained from Tjontveit the confidential information he would later use against Wien Air. He also met with Wien Air during April of 1991. During the April meeting, Brandt allegedly made misrepresentations regarding his continuing legal representation of Wien Air. Brandt, however, claims he was no longer Wien Air's attorney during this time period (and thus under no duties) because his services as company attorney were terminated on April 6, 1991, as pleaded in Wien Air's complaint.

Even if Brandt's services were terminated on April 6, 1991, the evidence shows that on April 10, Tjontveit stated that he was not halting Brandt's services except with respect to the GAC dispute. His letter to Brandt dated April 10 reads: "I want to make it clear that I am not discharging you as my attorney and I wish to continue our relationship as attorney and client." It continues to say "[i]f we can settle the GAC dispute satisfactor[il]y to both of us it is my wish that I can revoke this

12

letter and we can reestablish our relationship as we did before this dispute arose."

Furthermore, at the April 22, 1991 meeting, Brandt demanded payment for past legal services for dates up to and including the meeting dates, indicating a continuing attorney relationship with Wien Air. Brandt also allegedly promised that he was still functioning as Wien Air's attorney at that meeting in Texas and also promised to complete legal work for Wien Air that he supposedly had already started. This also indicates that an attorney client relationship continued to exist.

An attorney-client relationship can be limited without canceling it, and even a terminated relationship can be resumed. Construing the facts most favorably to the plaintiff, this is what appears to have occurred. Furthermore, by virtue of his alleged misrepresentations, Brandt induced the plaintiff to sign a document allowing Brandt to withdraw nearly $1 million from a trust account in Germany. Brandt also failed to disclose information regarding the GAC deal, insofar as Brandt allegedly no longer represented Wien Air's interests.

According to the evidence, Wien Air relied to its detriment on such misrepresentations and omissions when it authorized Brandt to take even more of Wien Air's money with the hope that finally the GAC deal would close. Brandt claims that no material fraud or misrepresentations could have occurred at the April, 1991 meetings in Texas because all relevant contracts had already been entered into. Thus, none of his representations could have been relied

13

upon in relation to the contracts, since they already were formed.

This does little to combat the claims of breach of contract with respect to fiduciary duty, however. Furthermore, the evidence shows that the GAC deal had not closed as of April 22, 1991. Given Brandt's assertion that the GAC contract was <u>invalid</u>, it does not behoove him to argue that it was already entered into. Construing the situation most favorably to the plaintiff, the parties appeared to have been continually modifying a deal whose terms had yet to become final until the April meetings. The fact that the defendant's partner may have already converted the entire purchase price of DM 5 million does not mean that Wien Air did not detrimentally rely on the defendant's representations in Texas in April: Wien Air authorized Brandt to receive an additional DM 1.3 million in order to close the GAC deal. Then, during the next month, Wien Air went to New York in hopes of closing this deal, only to be thwarted again. All of this shows detrimental reliance.

This case is most similar to <u>Carteret Savings Bank, F.A. v. Shushan</u>, 954 F.2d 141 (3rd Cir. 1992). <u>Carteret Savings</u> concerned misrepresentation and breach of fiduciary duty claims. Minimum contacts were found when the defendant directed letters and phone calls to the forum and then went to the forum for a final meeting in which he failed to advise his client of material facts regarding conflicts of interest. <u>Id.</u> at 149. Similar to the present case, the meeting in <u>Carteret Savings</u> was a meeting regarding a business transaction prior to the closing of the deal. <u>Id.</u> at 146, 149.

14

Not only did the court in Carteret Savings find minimum contacts, but the court also found it insignificant that the defendant might have come to the forum at the request of the plaintiff or that the defendant might not have initially solicited the plaintiff's business. Id. 150. We likewise find irrelevant such allegations by the defendant. For all of these reasons, we find that Wien Air has established a prima facie case of minimum contacts over Brandt with respect to its claims for fraud, fraudulent inducement, breach of contract and breach of fiduciary duty.

Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair. See Akro Corp. v. Luker, 45 F.3d 1541, 1547 (Fed. Cir. 1995). To show that an exercise of jurisdiction is unreasonable once minimum contacts are established, the defendant must make a "compelling case" against it. Burger King Corp v. Rudzewicz, 471 U.S. 462, 477 (1985). It is rare to say the assertion is unfair after minimum contacts have been shown. Akro, 45 F.3d at 1549. The standards to be used are the "traditional notions of fair play and substantial justice." Felch, 92 F.3d at 323 (quoting Wilson 20 F.3d at 647; Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)). The interests to balance in this determination are the burden on the defendant having to litigate in the forum; the forum state's interests in the lawsuit; the plaintiff's interests in convenient and effective relief; the judicial system's interest in efficient resolution of controversies; and the state's shared interest in furthering fundamental social policies. See

15

<u>Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.</u>, 9 F.3d 415, 421 (5th Cir. 1993).

If a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities that give rise to personal jurisdiction, an exercise of jurisdiction likely comports with the due process clause, given the obvious interests of the plaintiff and the forum state.  <u>See, e.g.</u>, <u>D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.</u>, 754 F.2d 542, 548 (5th Cir. 1985).

Brandt claims the assertion would be unfair and unreasonable because he is a German citizen, most of the witnesses are in Germany, the courts in the U.S. would not be able to subpoena the German witnesses, German law applies to all of the issues, the judicial system's interest in efficiency would dictate Germany should resolve this dispute, and Texas has no interest in the case. Wien Air's prima facie evidence disputes many of these assertions, especially the issue of where most of the witnesses reside and whether they would be available to testify.

Admittedly, litigation in the U.S. would place a burden on the defendant.  However, once minimum contacts are established, the interests of the forum and the plaintiff justify even large burdens on the defendant.  <u>See</u> <u>Asahi</u>, 480 U.S. at 115.  Moreover, Texas clearly has an interest because the dispute involves a corporation whose principal place of business is in Texas, and the corporation allegedly was defrauded.  This distinguishes <u>Asahi</u>, in which no California parties remained in the lawsuit by the time the issue of

16

personal jurisdiction in California arose.  See id. at 114.

Resolving the conflicts in a light most favorable to the plaintiff, we find no overwhelming burden to the defendant that outweighs the legitimate interests of the plaintiff and the forum state.  At most Brandt demonstrates an inconvenience which would be equally felt by forcing the plaintiff to litigate in Germany. For all of these reasons, we hold that the assertion of jurisdiction over the defendant is fair and reasonable.

REVERSED and REMANDED.