REVISED February 27, 2008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————

No. 06-30886

————

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 6, 2008

Charles R. Fulbruge III
Clerk

WALK HAYDEL & ASSOCIATES INC

Plaintiff

v.

COASTAL POWER PRODUCTION COMPANY; ET AL

Defendants

LATIN AMERICAN ENERGY DEVELOPMENT INC, doing business as
DELASA

Third-Party Plaintiff - Appellant

v.

WINSTON & STRAWN LLP

Third-Party Defendant - Appellee

————

Appeal from the United States District Court
for the Eastern District of Louisiana

————

Before REAVLEY, STEWART, and OWEN, Circuit Judges.

REAVLEY, Circuit Judge:

Latin American Energy Development, Inc. d/b/a Delasa ("Delasa"), a Louisiana corporation, alleged claims against Winston & Strawn, LLC ("W&S"), a Chicago-based law firm, for fraud, breach of contract, and breach of fiduciary duty.[1]  The suit arises out of an attempt by Delasa and others to acquire a contract to build a power plant in El Salvador, with W&S allegedly providing legal representation for the joint venturers, including Delasa.  Delasa claims that W&S was supposed to be representing its interests, but in fact enabled another of its clients, Tenneco Gas, Inc., to obtain the project and extinguish Delasa's rights in it.  In response to W&S's motion to dismiss for lack of personal jurisdiction, the district court held a hearing and granted the motion, dismissing Delasa's case.  We reverse and remand because Delasa established a prima facie case for specific personal jurisdiction, and the district court's evidentiary hearing was inadequate to require more.

## I. Factual Background

In January 1994, co-developers and partners Delasa, La Casa Castro, United Thermal Development Corporation ("UTDC"), and Independent Energy Corporation ("IEC") submitted a successful bid for the right to develop and operate a power plant in El Salvador.  Winning the bid gave the partners the exclusive right to negotiate and execute a power purchase agreement with El Salvador's national power utility.

UTDC's main role was to provide project funding.  It had a 75% interest in the project, while Delasa's interest was 10%.  UTDC agreed to pay the project's development expenses, including the retention of legal counsel.  Jim Abromitis, then-president of UTDC, retained Paul Abramson, a New York-based partner with W&S.  Abramson agreed to draft documents related to the project, including the power purchase agreement and a joint-venture agreement among the co-developers.  John Wheelock, Delasa's then president, maintains in his

---

[1] Although other parties were originally part of the suit, Delasa and W&S are the only remaining parties.

affidavit that Abromitis said that W&S would represent all four parties, including Delasa, in negotiations with third parties. When Trigen Energy Corporation subsequently acquired UTDC, it continued to retain W&S and Abramson in conjunction with the project.

In February 1994, Abromitis advised the other partners that Trigen was no longer interested in participating in the project. But he stated that Trigen would honor and fulfill all of its obligations with respect to the bid and negotiations, and that Trigen would help the other partners find a replacement investor for the project. Abromitis says that he contacted several developers, including Tenneco, as potential replacements. At that time, W&S and Abramson represented Tenneco with respect to unrelated projects in Latin America. Abramson had also been helping Tenneco develop a profile of projects for investment in Latin America. Abramson introduced a Tenneco executive to Abromitis because he knew that Abromitis was interested in finding another investor to take over all or part of Trigen's interests in the project.

On March 6, 1994, Floyd Lewis, a former attorney and a consultant to Delasa on the project, faxed a message to Abramson entitled, "Agreement Among Joint Venture Participants." The first paragraph of the fax states: "We trust that with respect to the subject document, which you have said will be delivered 'in New Orleans' . . . your intent is to function as counsel to all of the parties and not just as lawyer for UTC [Trigen] and IEC against the others. If we are in error in this assumption, please make it clear to us so that appropriate legal counsel can be engaged to look after our interests." The New Orleans reference is to a conference where there was a meeting involving the joint venturers, Tenneco, and Abramson, which is discussed below. Abramson responded via fax the next day:

> As for your comments on the agreement among the parties, as you know there may be legal conflicts among the positions of the

> four parties, and Winston & Strawn will represent UTC [Trigen] [insofar] as there are any such conflicts.
>
> Naturally, Winston & Strawn believes it has been engaged to represent all four parties in their negotiations with others. We trust that one of the principals will advise us if this is in error.

(emphasis added). Wheelock concluded that this fax confirmed that W&S was representing the joint venturers in the negotiations with third parties, including those parties who would be recruited to assume Trigen's role in funding the project.

On March 9, 1994, the joint venturers traveled to New Orleans to attend the 9th Annual Cogeneration and Development Power Conference. In connection with the events in New Orleans, Abramson said he would deliver the Joint Venture Agreement to the partners. The project partners and Abramson were also to meet with potential investors to find a party to replace Trigen or to assist Trigen in funding the project. Delasa was aware that several potential investors would be present at the conference. Wheelock and Lewis state that the parties and W&S understood that the joint venturers would have to disclose proprietary and confidential information about the project, including the "financial performer models," to potential investors. For this reason, they say that Abramson was instructed to draft and deliver a confidentiality agreement to Tenneco prior to the meeting in New Orleans, which he never did.

Delasa met with Tenneco at the conference to discuss its potential involvement in the project. According to Wheelock, prior to the conference Abramson stated that all four parties should meet with Tenneco in New Orleans and indicated that Tenneco had an interest in taking all or part of Trigen's interest in the project. Delasa representatives met with Tenneco during a golf tournament and lunch hosted by W&S. Based on the March 7 fax, which confirmed W&S's representation of the project partners vis-à-vis third parties,

Wheelock and Lewis say that Delasa felt comfortable divulging sensitive and propriety information concerning the project to one of W&S's contacts, Tenneco. But while Delasa's representatives knew that W&S had represented Tenneco in the past, they say that they did not know that Abramson was then representing Tenneco in its efforts to develop a profile of projects in Latin America.

After the New Orleans meeting with Tenneco, there was correspondence and a series of meetings between the joint venturers and Tenneco, where they discussed the possibility of Tenneco replacing Trigen. Eventually, Tenneco and the joint venturers agreed that Tenneco would be brought into the deal.

Delasa worked with W&S from its base in Louisiana during the negotiations with Tenneco. In fact, during the course of W&S's alleged representation of the parties, there were over a hundred contacts between Delasa and W&S in the form of telephone calls, correspondence, and faxes. These contacts generated over 3,400 pages of documents, many of which were sent from W&S's offices to Delasa in Louisiana.

In April 1994, the partners signed the joint-venture agreement, which was now known as the Three Party Agreement because only Delasa, Trigen, and La Casa Castro remained involved, with IEC dropping out of the project. The agreement had a provision for the intended transfer of Trigen's interest to Tenneco. W&S was heavily involved in the writing of the document and corresponded frequently with all the parties, including Delasa in Louisiana, during the drafting process.

On May 17, 1994, the parties flew to El Salvador to execute the power purchase agreement. All parties understood that Trigen would be the only joint venturer to sign the agreement. But just prior to executing it, Trigen informed the parties that it wanted to withdraw completely from the project. This was on the last day of the time period for executing the agreement. As a last-minute solution, Trigen transferred its 75% interest to Tenneco. Delasa and La Casa

5

Castro then were asked to sign a hand-written release with Trigen in which Delasa and La Casa Castro released Trigen "from any and all obligations to each of them whatsoever" in exchange for Trigen signing the agreement.

Wheelock says that when all this was occurring he asked Abramson if signing the release would affect Delasa's interest in the project, and Abramson assured him that it would not and advised him to sign the release. According to Wheelock and Abromitis, all those present, including Abramson, told Wheelock that the release would not affect Delasa's ownership interest in the project.

But Tenneco relied on the release to claim 100% ownership of the project and to deny Delasa's interest in it. After Tenneco acquired Trigen's interests in the project, W&S assumed the representation of Tenneco in the project and provided legal services to Tenneco in connection with Tenneco's sale of its rights in the power purchase agreement to Coastal Power and Production Company. Delasa contends that Abramson counseled Tenneco in its efforts to claim 100% ownership of the plant.

## II. Procedural History

Litigation related to the El Salvador project was commenced in Louisiana state court against Delasa and others. Delasa added W&S to the suit by third-party demand, claiming that Abramson enabled Tenneco to obtain the project for itself and to unfairly extinguish Delasa's interest in it through a series of misrepresentations and failures to disclose material information. W&S removed the suit and moved for dismissal based on lack of personal jurisdiction and insufficiency of process. Delasa moved for jurisdictional discovery on the issues of specific and general jurisdiction and said that depending on responses to interrogatories and admissions, it might need to depose Abramson and other parties essential to its jurisdictional case. The district court granted the motion only as to a document request for correspondence in W&S's possession that was directed from W&S to Delasa in Louisiana. The court denied discovery on

6

general jurisdiction. Later, Delasa moved for oral argument and live testimony in connection with the evidentiary hearing, which the district court denied.

The district court eventually held that W&S was not subject to the jurisdiction of a Louisiana court. The district court did not state the legal standard it was applying to W&S's motion, only saying that "[b]ecause the Court is now deciding the personal jurisdiction issue following an evidentiary hearing, Delasa is no longer entitled to rely upon a prima facie showing of jurisdiction grounded on unsupported allegations." Delasa's suit was dismissed.

Delasa appeals. Its contention that discovery should have been allowed on general jurisdiction is rejected because the denial was within the court's discretion. We reverse the court's judgment denying specific jurisdiction.

### III. Discussion

#### A. Standard Applicable to W&S's Motion to Dismiss

We review de novo the district court's conclusion that W&S is not subject to the jurisdiction of a Louisiana court.[2] The first step in our review is to determine the legal standard the district court should have applied to W&S's motion to dismiss despite an initial holding that Delasa made out a prima facie case for personal jurisdiction.

When the defendant disputes the factual bases for jurisdiction, as W&S does here, the court may receive interrogatories, depositions, or "any combination of the recognized methods of discovery" to help it resolve the jurisdictional issue.[3] The court has discretion as to the type and amount of discovery to allow. But even if the court receives discovery materials, unless there is a full and fair hearing, it should not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with

---

[2] Guidry v. U.S. Tobacco Co., Inc., 188 F.3d 619, 625 (5th Cir. 1999).

[3] Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985).

the undisputed facts.[4] Moreover, at this stage the plaintiff is required to present only a prima facie case for personal jurisdiction.[5] The Ninth Circuit has explained why:

> If the court determines that it will receive only affidavits or affidavits plus discovery materials, these very limitations dictate that a plaintiff must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss. Any greater burden such as proof by a preponderance of the evidence would permit a defendant to obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavit and supporting materials.[6]

Ultimately, the plaintiff must show by a preponderance of the evidence that jurisdiction is proper.[7] Often, the determination of whether this standard is met is resolved at trial along with the merits. This is especially likely when the jurisdictional issue is intertwined with the merits and therefore can be determined based on jury fact findings.[8] In this situation, it is often "preferable that [the jurisdictional] determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits."[9] But this court has said that after a pretrial

---

[4] Guidry, 188 F.3d at 625; Thompson, 755 F.2d at 1165; DeMelo v. Toche Marine, Inc., 711 F.2d 1260, 1270–71 (5th Cir. 1983).

[5] Irving v. Owens-Corning Fiberglas Corp., 864 F.2d 383, 384 (5th Cir. 1989); Thompson, 755 F.2d at 1165.

[6] Data Disc, Inc., v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977) (footnote omitted).

[7] Brown v. Slenker, 220 F.3d 411, 419 (5th Cir. 2000).

[8] See id. (holding that because the personal jurisdiction issue erroneously decided as a matter of law by the district court was intertwined with the merits, "on remand both [had to be] decided at a new trial, based on valid jury findings").

[9] Data Disc, 557 F.2d at 1285–86 n.2; cf. McBeath v. Inter-Am. Citizens for Decency Comm., 374 F.2d 359, 363 (5th Cir. 1967) (holding that "where the factual and jurisdictional issues are completely intermeshed, the jurisdictional issues should be referred to the merits,

evidentiary hearing confined to the jurisdictional issue, where both sides have the opportunity to present their cases fully, the district court can decide whether the plaintiff has established jurisdiction by a preponderance of the evidence.[10] The district court relied on these cases and required Delasa to establish more than a prima facie case for personal jurisdiction because, in its estimation, it was deciding the jurisdictional issue following an evidentiary hearing. This was error.

The hearing in this case was inadequate to justify raising Delasa's burden above the prima facie level. A pretrial evidentiary hearing is intended to serve as a substitute for the resolution of factual and legal disputes relevant to jurisdiction at trial. As such, both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion and as long as the discovery pertains to the personal-jurisdiction issue. Furthermore, if requested by the parties, the district court often should convene a hearing where it entertains live testimony. In Data Disc the Ninth Circuit held that at a hearing where a court requires more than a prima facie case it should allow the plaintiff "to go[] beyond the written materials."[11]

The district court only partially granted Delasa's motion for jurisdictional discovery. Delasa asked for written discovery in the form of interrogatories, requests for production, and requests for admissions from W&S, but the district court granted Delasa discovery only as to a document request for correspondence

---

for it is impossible to decide one without the other").

[10] Felch v. Transportes Lar-Mex SA DE CV, 92 F.3d 320, 326–327 (5th Cir. 1996); Travelers Imdem. Co. v. Calvert Fire Ins. Co., 798 F.2d 826, 831 (5th Cir. 1986). Other circuits allow district courts to hold pretrial evidentiary hearings on personal jurisdiction. See, e.g., AT&T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588–89 (9th Cir. 1996); Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

[11] 557 F.2d at 1285.

in W&S's possession that was directed to Delasa in Louisiana. By substantially curtailing the amount of discovery that could be obtained, the court erred in requiring more than a prima facie showing of jurisdiction from Delasa. Significantly, the district court did not allow Delasa to take any depositions of parties essential to its jurisdictional case, including Abramson. W&S argues that this was not required because Abramson was deposed in related litigation. But in that litigation personal jurisdiction over W&S in Louisiana was not at issue. The deposition of Abramson in the related litigation was not a substitute for a deposition in this case as to personal jurisdiction. The court also denied Delasa's request for live testimony. Without live testimony in this case—where examination of Abramson and other relevant witnesses, such as Wheelock and Lewis, would help resolve factual disputes dispositive of the jurisdictional question—the court could not require more than a prima facie case from Delasa. Because the district court did not conduct a full-blown evidentiary hearing, it should have required Delasa to establish only a prima facie case for personal jurisdiction. Therefore, our review is restricted to determining whether Delasa met this burden.

## B. Specific Jurisdiction

Delasa has established a prima facie case for specific personal jurisdiction. A federal district court has personal jurisdiction over a nonresident defendant to the same extent as a state court in the state in which the district court is located—in this case, Louisiana.[12] The Louisiana Supreme Court has held that the limits of the Louisiana long-arm statute are coextensive with constitutional due process limits.[13] Therefore, we must determine whether jurisdiction over W&S comports with federal constitutional guarantees. Exercising personal

---

[12] Access Telecom., Inc. v. MCI Telecomm. Corp., 197 F.3d 694, 716 (5th Cir. 1999).

[13] A&L Energy, Inc. v. Pegasus Group, 791 So. 2d 1266, 1270 (La. 2001).

jurisdiction over a nonresident defendant is compatible with due process when "(1) th[e] defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice."[14] Specific jurisdiction applies when a nonresident defendant "has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities."[15]

W&S's purposeful contacts with Louisiana, in combination with the foreseeable harmful effects in Louisiana of its allegedly illegal activity, makes specific jurisdiction proper. W&S's supposed formation of an attorney-client relationship with Delasa, a Louisiana corporation, standing alone does not confer specific personal jurisdiction. But asserting specific jurisdiction over W&S is consistent with Wien Air Alaska, Inc. v. Brandt, where we held that a German attorney's misrepresentations and omissions directed toward Texas, while limited, were sufficient contacts to confer personal jurisdiction over him in a Texas court.[16]

Here, Delasa has provided evidence through the March 7 fax that Abramson assured Delasa it was legally representing its interests, as a member of the joint venture, in their negotiations with potential replacement investors. W&S argues that the fax does not confirm that W&S was to represent Delasa's individual interests. It says that the reference to others was limited solely to

---

[14] Panda Brandywine Corp. v. Potomac Elec. Power Co., 253 F.3d 865, 867 (5th Cir. 2001) (internal quotation marks omitted).

[15] Id. at 868 (internal quotation marks omitted).

[16] 195 F.3d 208, 212–13 (5th Cir. 1999); see Trinity Indus., Inc. v. Myers & Assocs., Ltd., 41 F.3d 229, 231 (5th Cir. 1995) (holding that personal jurisdiction over nonresident attorneys was proper where the "essence of [the plaintiff's] complaint is that its own lawyers counseled its competitor in bringing adverse litigation").

11

representation vis-à-vis the El Salvadorean Government.  But given that in the fax Abramson clarified W&S's representation of Trigen in negotiations with the other joint venturers separately from his confirmation that W&S "has been engaged to represent all four parties in their negotiations with others," a fair reading of Abramson's statements suggests that W&S was affirming that it would represent the four parties, including Delasa, in their negotiations with third parties such as Tenneco.  Indeed, the district court even found that "[i]t is undisputed that W&S represented a joint venture of which Delasa was a participating entity.  If Abramson did in fact counsel Tenneco in its efforts to take a position contrary to Delasa's interests then Abramson might very well have breached a duty owed to Delasa."

If W&S breached its duty to Delasa by simultaneously representing Tenneco contrary to Delasa's interests and ultimately aiding Tenneco in excluding Delasa from the project, the litigation relates to activities and omissions directed at Louisiana sufficient to confer specific jurisdiction.  W&S arranged for a meeting between Delasa's group and Tenneco during the Power Conference in New Orleans while Abramson was "helping Tenneco develop a profile of projects" in Latin America.  But Abramson did not disclose this to Delasa even while Delasa was meeting with Tenneco in New Orleans to see if Tenneco was an appropriate investor for the project.  Had he disclosed this conflict of interest, Delasa says that it would not have candidly discussed the project with Tenneco, disclosed confidential information to Tenneco that helped it obtain full ownership of the project, or trusted Abramson's representation, and, at a minimum, it would have more carefully scrutinized Tenneco's suitability as an investor.  Delasa might also have thought twice before taking Abramson's advice and signing the release freeing Trigen from any obligations to Delasa—a release that Tenneco eventually used, under Abramson's counsel, to deny Delasa an interest in the project.

W&S argues that the importance of the New Orleans meeting to Delasa's claim is overstated. It argues that while W&S told Delasa about the golf tournament in New Orleans, it was Trigen's Abromitis that specifically invited Delasa to talk with Tenneco. But Delasa has presented credible evidence that W&S told Delasa about the meeting in New Orleans and that Abramson was there when Delasa was discussing the project with Tenneco. Therefore, we must accept Delasa's plausible version of the events at this stage of the litigation.

W&S also argues that the meeting in New Orleans cannot be used to invoke jurisdiction because most of the meetings between Tenneco and Delasa during the spring of 1994 were in Texas and El Salvador. But even if there were other important meetings with W&S outside of Texas, the New Orleans trip was a first contact where Delasa and Tenneco were put together to discuss the power plant project. We held in Wien Air that a single act by a nonresident defendant attorney towards the forum state can support a finding of minimum contacts, and the failure of W&S to discuss its conflict of interest at the New Orleans meeting could have been such a contact.[17] It is difficult to know without full development of the facts.

The factual scenario in this case is analogous to the Third Circuit's decision in Carteret Savings Bank v. Shushan,[18] a case cited with approval in Wien Air.[19] Like this case, Cateret involved a visit by an attorney to the forum state in connection with a construction project in another state—specifically, to review closing documents with the bank financing the project. Similar to what occurred here, the attorney in Cateret failed to disclose a conflict of interest while in the forum state, giving rise to the cause of action for fraudulent

---

[17] 195 F.3d at 212.

[18] 954 F.2d 141 (3d Cir. 1992)

[19] See 195 F.3d at 215.

13

misrepresentation and breach of fiduciary duty. Most of the relevant activity, including preparation of the closing documents, occurred in the non-forum state. But the court found personal jurisdiction appropriate because the conduct that did occur in the forum state—i.e., the failure of the attorney to disclose his prior and continued representation of another participant in the project—gave rise to the cause of action.[20] Delasa alleges that the same thing occurred here, with W&S failing to disclose at the New Orleans meeting its ongoing representation of Tenneco during its efforts to develop a profile of projects in Latin America.

In addition to the New Orleans meeting, there are other Louisiana contacts supporting Delasa's prima facie case. In connection with its alleged attorney-client relationship, including preparation for Trigen's assignment to Tenneco of its interests in the project, Delasa and W&S exchanged over a hundred contacts in the form of telephone calls, faxes, and letters concerning the project, generating over 3,400 pages of documents, many of which were sent from W&S's offices to Delasa in Louisiana. These contacts included W&S's delivery into Louisiana of the Joint Venture Agreement, which perfected Delasa's interest in the project and which Delasa executed in New Orleans. Through all of these communications, Delasa maintains that Abramson failed to disclose W&S's close relationship with Tenneco and its apparent conflict of interest. In Wien Air, this court specifically stated that "when the claim [against a lawyer] arises from a breach of a fiduciary duty based on a failure to disclose material information, the fact that the lawyer continually communicated with the forum while steadfastly failing to disclose material information shows the purposeful direction of material omissions to the forum state."[21] W&S's failure to disclose the extent of

---

[20] Cateret, 954 F.3d at 145–50.

[21] 195 F.3d at 213 (citing Diamond Mortgage Corp. v. Sugar, 913 F.2d 1233 (7th Cir. 1990)).

its relationship with Tenneco during these communications indicates "the purposeful direction of material omissions to [Louisiana]."

We also consider the foreseeable harmful effects in Louisiana of W&S's alleged intentional tort.[22] While generally insufficient alone to confer jurisdiction, "the foreseeable effects of a tort" should be considered "as part of the analysis of the defendant's relevant contacts with the forum."[23] According to Delasa, W&S performed several tortious activities outside of Louisiana that had foreseeable effects in the forum. These contacts include the myriad communications with Delasa in Louisiana in which W&S failed to disclose the extent of its relationship with Tenneco, all the while allegedly providing legal counsel to Delasa and the other joint venturers in their efforts to bring a replacement investor into the project. These tortious activities, if proved by Delasa at trial, had foreseeable effects in Louisiana, Delasa's base of operations. Based on the foregoing, Delasa has made out a prima facie case of minimum contacts by W&S with Louisiana sufficient to confer specific personal jurisdiction.

"Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show that the assertion of jurisdiction would be unfair."[24] As in Wien Air, the assertion of jurisdiction is fair. We have held that in a case like this, where a cause of action for fraud committed against a resident of the forum is directly related to the tortious activities giving rise to personal jurisdiction, the exercise of that jurisdiction will be considered fair.[25] We have also recognized that the forum state has a substantial interest in protecting its

---

[22] Wien Air, 195 F.3d at 212.

[23] Id. (internal quotation marks omitted).

[24] Id. at 215.

[25] Id.

residents from a breach of the attorney-client relationship.[26]  Nor would it be unduly burdensome to require W&S, an international law firm with over 900 attorneys, to litigate the case in Louisiana.

The judgment is REVERSED and the cause is REMANDED for proceedings consistent with this opinion.

---

[26] Trinity Industries, 41 F.3d at 232.