**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1770**

SECURITIES & EXCHANGE COMMISSION,

      Plaintiff,

    v.

RECEIVER FOR REX VENTURES GROUP, LLC,

      Defendant – Appellant,

    v.

BANCA COMERCIALA VICTORIABANK SA

      Party-in-Interest – Appellee,

    and

REX VENTURE GROUP, LLC, d/b/a Zeekrewards.com; PAUL R. BURKS; TRUDY GILMOND; KELLIE KING; BBVA COMPASS,

      Defendants.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Graham C. Mullen, Senior District Judge.  (3:12-cv-00519-GCM)

Argued:  October 26, 2017                     Decided:  March 26, 2018

Before GREGORY, Chief Judge, KEENAN, Circuit Judge, and SHEDD, Senior Circuit Judge.

Reversed and remanded by unpublished per curiam opinion.

_____

**ARGUED:** Kenneth D. Bell, MCGUIREWOODS, LLP, Charlotte, North Carolina, for Appellant. Kiran H. Mehta, TROUTMAN SANDERS LLP, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Irving M. Brenner, Amanda W. Abshire, MCGUIREWOODS, LLP, Charlotte, North Carolina, for Appellant. Lindsey B. Mann, Kathleen Campbell, TROUTMAN SANDERS LLP, Atlanta, Georgia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kenneth D. Bell, the appointed receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com (RVG), appeals the district court's conclusion that it lacked personal jurisdiction over Banca Comerciala Victoriabank SA (Victoriabank), a Moldovan bank. Because the district court erred in requiring the Receiver to prove jurisdiction by a preponderance of the evidence, we reverse.

I.

RVG operated ZeekRewards, a combined Ponzi and pyramid scheme that solicited investors to participate in an advertising division for a penny auction website.[1] On August 17, 2012, the Securities and Exchange Commission filed a civil enforcement action against RVG and its principal, Paul Burks. On the same day, the district court filed an order freezing all of RVG's assets (the Freeze Order) and appointing Bell as the Receiver. The Freeze Order obligates persons and financial institutions to freeze funds that RVG owned or could make a claim on and return these funds to the Receiver.

This appeal arises from the Receiver's efforts to recover more than $13 million of RVG assets held at Victoriabank at the time of the Freeze Order. Victoriabank is a commercial bank with its headquarters and principal place of business in the country of Moldova. To further understand the facts relevant to the question before us—whether the

---

[1] RVG received money from more than 800,000 individuals and obtained funds in excess of $800 million.

district court has personal jurisdiction over Victoriabank—we must examine how funds flowed in the ZeekRewards scheme.

## A.

Money was transferred to and from ZeekRewards through various digital wallet companies,[2] including a company called Payza. Payza used multiple payment-processing entities, each named "PaymentWorld," and their sponsoring banks to service these transactions. Initially, PaymentWorld, LLC ("PW-USA"), a California-based merchant service provider, identified Payza as needing payment-processing services. But PW-USA directly processed with only U.S. banks, and Payza was TMF-listed,[3] meaning no U.S. bank would agree to do business with it. PW-USA therefore referred Payza to PaymentWorld Limited ("PW-HK"), a Hong Kong-based internet payment service processor. PW-HK connected Payza with two Russian banks, Master Bank and Tusar Bank. Master Bank agreed to serve as Payza's acquiring bank,[4] and Tusar Bank served as

---

[2] Digital wallet companies are companies that allow investors to deposit and remove funds electronically.

[3] TMF, which stands for "Terminated Merchant File," is a database that lists merchants that have been terminated for cause and functions as a blacklist that banks use to screen high-risk merchants.

[4] An acquiring bank maintains a merchant's bank account and, as a member of a card association (e.g., Visa, MasterCard), enables the merchant to accept credit-card payments. Acquiring banks also bear the risk of fund reversals, such as refunds, cancelled transactions, and chargebacks.

4

the settlement bank for all payments processed through PW-HK and Master Bank.[5] PW-USA kept itself involved in the processing chain by serving as Payza's merchant service provider and the payment gateway through which Payza interacted with PW-HK and the acquiring and settlement banks.

In practice, when an investor used Payza to make a payment to ZeekRewards, PW-USA transmitted the transaction information to Master Bank, Master Bank acquired the funds from the credit-card company, and PW-HK transferred those funds from Master Bank to Tusar Bank for settlement and then shifted them to Payza.

In May 2012, Master Bank informed PW-USA and PW-HK that it would no longer process payments from Payza. PW-USA and PW-HK therefore needed a new acquiring bank for Payza. According to an affidavit submitted by the CEO and owner of PW-USA, Roman Balanko, he and the sole owner of PW-HK, Alexander Korkin, met with the "owner and majority shareholder" of Victoriabank, Vyacheslav Platon, in Moldova to discuss using Victoriabank as Payza's acquiring bank. "Mr. Platon agreed that Victoriabank could process transactions so long as he too could participate in the processing chain as an additional settling entity called ICS Payment World SRL" ("PW-

---

[5] A settlement bank facilitates credit-card transactions between consumers and merchants by taking information about each transaction and ensuring that the correct amount of money is exchanged between the issuing bank (i.e., the bank that issued the credit card to the consumer) and the acquiring bank.

Moldova").[6]  After Platon formed PW-Moldova, Victoriabank replaced Master Bank as Payza's acquiring bank.

A percentage of each Payza transaction was held in reserve in PW-Moldova's account at Victoriabank to cover any chargebacks, reversals, or other potential risks. According to the Receiver's calculations, Victoriabank held $13,174,015.48 in RVG assets when the district court issued the Freeze Order.

After the district court entered the Freeze Order, Balanko called and emailed Victoriabank to inform it of the Freeze Order. The Receiver also sent written notice of the Freeze Order to Victoriabank no later than September 17, 2012, informing Victoriabank—in bold, underlined font—that "**The Receivership Assets in the ICS [PW-Moldova] Account are subject to the Freeze Order**". (J.A. 344). The written notice was not in Romanian (the official language of Moldova), and the Freeze Order was never domesticated in Moldovan court.

On September 25, 2012, $15.5 million was transferred from PW-Moldova's Victoriabank account, routed through Victoriabank's correspondent bank account at Bank of New York Mellon (BNYM), and sent to a PW-HK account with the Tusar Bank. The money was then transferred again to an account for Payment World Limited Russian

---

[6] The exact timing of this meeting, and the creation of PW-Moldova, is unclear.

Federation at Master Bank. [7] Master Bank has since closed, and it appears those funds are effectively beyond recovery.

Victoriabank opened its BNYM correspondent account in 2008. "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds." *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) (internal quotation marks omitted). These accounts "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Id.* (internal quotation marks omitted). Victoriabank's correspondent account averages roughly 1,500 transactions per month totaling around $200 million in credits and debits.

B.

In 2016, after the Receiver made several unsuccessful attempts to obtain the PW-Moldova funds, the district court granted the Receiver's motion for contempt and froze $13,174,015 held in Victoriabank's BNYM correspondent account as substitute assets for the money transferred from PW-Moldova's account. Victoriabank promptly moved to dissolve the order, arguing that the district court lacked personal jurisdiction over it. The Receiver moved in opposition and requested jurisdictional discovery. The district court denied the request for full jurisdictional discovery but allowed the Receiver to (1) get

---

[7] The parties vigorously dispute the interrelation of the PaymentWorld entities and Victoriabank. The district court noted these relationships were "murk[y]" (J.A. 740), but we need not delve into this murkiness to decide the appeal.

document production in the United States in the form of third-party subpoenas from BNYM and (2) depose Balanko.

After the Receiver conducted this limited discovery, both sides filed supplemental briefs on personal jurisdiction. The district court held a hearing on the issue and, at the close of that hearing, granted Victoriabank's motion to dissolve the order. The court began by holding that, because the Receiver had conducted some jurisdictional discovery, it had to prove personal jurisdiction by the preponderance of the evidence. The court then found that the Receiver's evidence fell short of that standard. First, the court held that Victoriabank's alleged violation of the Freeze Order did not give rise to jurisdiction because that order was never domesticated in Moldova. Second, the court held that Victoriabank's maintenance of a correspondent bank account did not give rise to specific personal jurisdiction. The district court stayed its order pending appeal, noting that the case was "unclear" and that this Court should have the opportunity to "review the case and weigh in on the disputed issues." (J.A. 752).

## II.

We review the district court's determination that it lacks personal jurisdiction over Victoriabank *de novo*. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). The Receiver argues that the district court erred in applying a preponderance of the evidence standard to prove jurisdiction at this preliminary stage. For the following reasons, we agree.

Although personal jurisdiction is an affirmative defense, once Victoriabank raised it, the Receiver had the burden of showing personal jurisdiction "at every stage."

8

*Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). That burden, however, changes depending upon the "stage" of the litigation. If a district court looks only at the initial court filings, "a plaintiff need only make a *prima facie* showing" that personal jurisdiction exists. *Id.* at 268. That approach is disfavored, and the "better course is for the district court to follow a procedure that allows it to dispose of the motion as a preliminary matter" applying a preponderance of the evidence standard. *Id.* An evidentiary hearing is not required before the preponderance standard attaches, but we do require district courts to "afford the parties a fair opportunity to present both the relevant jurisdictional evidence and their legal arguments," *id.*, using "procedures that provide the parties with a fair opportunity to present to the court the relevant facts," *id.* at 269. *See also Walk Haydel & Assoc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242 (5th Cir. 2008) (noting that before preponderance standard applies "both parties must be allowed to submit affidavits and to employ all forms of discovery, subject to the district court's discretion").[8]

Applying this framework in *Grayson*, we affirmed the district court's use of the preponderance of the evidence standard because the parties had engaged in a "full discovery process," and "[n]o party ever claimed that the record was inadequately

---

[8] In *Walk Haydel*, the Fifth Circuit explained that when a court "receive[s] only affidavits or affidavits plus discovery materials," requiring proof of personal jurisdiction "by a preponderance of the evidence would permit a defendant to obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavit and supporting materials." 517 F.3d at 241 (quoting *Data Disc., Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1977)).

developed, that relevant evidence was missing, or that it was unable to fairly present its position." *Grayson,* 816 F.3d at 269.

The Receiver contends that the district court erred in applying the preponderance standard in this case because "full discovery" did not occur, and the Receiver did "claim that the record was inadequately developed." We agree. In contrast to *Grayson*, the Receiver *did* complain that the record was incomplete and that the full discovery process had not occurred. During one hearing, the Receiver stated:

> [Victoriabank] keeps saying we have now completed jurisdictional discovery. We have not. We have not been permitted to obtain any discovery from Victoriabank . . . [W]e haven't finished all that can be done to establish jurisdiction.

(J.A. 734).

The Receiver reiterated this complaint in its district court filings, explaining he lacked "meaningful information regarding Victoriabank's contacts and business dealings with the United States, including 'PaymentWorld U.S.,' which controlled the account in Moldova that is at issue." *Securities and Exchange Commission v. Rex Venture Group*, 3:12-cv-00519, CM/ECF No. 521, at 9. When a district court significantly limits jurisdictional discovery, it has not given both sides the "opportunity to present their cases fully" and should apply a prima facie standard of proof. *Walk Haydel*, 517 F.3d at 242.

Accordingly, we find that the district court erred in requiring the Receiver to prove personal jurisdiction by preponderance of the evidence because it substantially curtailed jurisdictional discovery. We leave it to the district court in the first instance to determine whether to review the parties' initial filings and apply the lower standard of proof or

10

permit additional discovery to create a fuller evidentiary record before requiring the Receiver to prove jurisdiction by a preponderance of the evidence.[9] Should the court employ the lower standard, it "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

## III.

For the reasons stated above, we reverse the district court's dismissal of the freeze order against Victoriabank and remand for further proceedings consistent with our opinion.

*REVERSED AND REMANDED*

---

[9] Remanding to the district court, rather than applying a prima facie standard in the first instance, is particularly appropriate here given the murky factual record and the district court's familiarity with the entire SEC enforcement action against RVG.