# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2022

Lyle W. Cayce
Clerk

No. 21-20186

Danziger & De Llano, L.L.P.,

*Plaintiff—Appellant*,

*versus*

Morgan Verkamp, L.L.C.; Frederick M. Morgan, Jr., Esquire; Jennifer Verkamp, Esquire,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-144

Before Davis, Higginson, and Engelhardt, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

Danziger & De Llano, LLP, a Texas resident, sued Morgan Verkamp, LLC, and two of its members, all non-residents of Texas. The Texas-based district court granted the defendants' motion to dismiss for lack of personal jurisdiction. We AFFIRM.

I.

On January 15, 2020, Danziger & De Llano, LLP, ("Danziger") filed a complaint in the United States District Court for the Southern District of

No. 21-20186

Texas against Morgan Verkamp, LLC, and two of its members, Frederick M. Morgan, Jr., and Jennifer Verkamp (collectively "Morgan Verkamp").[1] The complaint, which raises claims of fraud, unjust enrichment, tortious interference with prospective contractual relations, and breach of contract, alleges the following relevant facts.

Danziger is a Texas-based law firm. Frederick Morgan and Jennifer Verkamp are attorneys residing in Ohio, and Morgan Verkamp, LLC, is an Ohio-based law firm. In 2006, Danziger referred two *qui tam* matters to Morgan Verkamp. The parties agreed to split the attorneys' fees in both cases, with 33 percent going to Morgan Verkamp, 33 percent to Danziger, and the remaining 34 percent divided in proportion to the hours each firm worked on the case. The following year, Danziger referred a potential *qui tam* relator named Michael Epp to Morgan Verkamp.[2] The parties agreed to split the fees from the Epp matter in the same manner as the previous cases.

Danziger stopped hearing from Epp in January 2008. However, Danziger and Morgan Verkamp continued to work together on the other two *qui tam* matters. In January 2010, Danziger asked Morgan Verkamp if a recently publicized *qui tam* settlement was related to the Epp case, and Morgan Verkamp replied that it was not. Shortly thereafter, Morgan Verkamp emailed a fee agreement to Epp. Danziger was not included on that

---

[1] Danziger had previously sued Morgan Verkamp in Pennsylvania, but the Third Circuit determined that Pennsylvania courts lacked personal jurisdiction over Morgan Verkamp. *See Danziger & De Llano, LLP v. Morgan Verkamp, LLC*, 948 F.3d 124 (3d Cir. 2020).

[2] Though Danziger's complaint makes no allegations regarding Epp's residence, Morgan Verkamp asserts that "Mr. Epp is a German national who lived in Dubai . . . and Thailand" during the relevant time periods. Danziger does not challenge this statement, and the district court accepted it. Further, there is evidence in the record supporting this assertion. For purposes of this appeal, the important fact is that Danziger does not allege, and we have no reason to infer, that Epp had any connection to Texas other than Danziger.

No. 21-20186

email, though Morgan Verkamp assured Epp that Danziger would be "reasonably compensated."

In March 2010, Morgan Verkamp filed suit on Epp's behalf in a Pennsylvania federal court. Morgan Verkamp never informed Danziger that it was representing Epp. In 2016, while investigating a lawsuit against Morgan Verkamp related to one of the other *qui tam* cases that the parties had worked on together,[3] Danziger learned that Morgan Verkamp had received over $5 million in attorneys' fees as a result of its representation of Epp.

Danziger argues that Morgan Verkamp owes it $2,133,333, in accordance with the firms' alleged fee-sharing agreement. After Danziger filed this complaint, Morgan Verkamp moved to dismiss the case for both lack of personal jurisdiction and failure to state a claim. The district court concluded that dismissal was appropriate on personal jurisdiction grounds and accordingly granted the motion. Danziger appealed.

II.

"[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true." *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990). For purposes of this appeal, Morgan Verkamp does not dispute Danziger's factual allegations. "A district court's dismissal of a suit for lack of personal jurisdiction where the facts are not disputed is a question of law, which is reviewed *de novo*." *Herman v. Cataphora, Inc.*, 730 F.3d 460, 464 (5th Cir. 2013). "The party invoking the court's jurisdiction bears the burden of establishing that a defendant has the

---

[3] The two *qui tam* matters that Danziger initially referred to Morgan Verkamp involved relators named Vanderslice and Galmines. Although the two firms split the fees from the Vanderslice matter in accordance with their arrangement, Morgan Verkamp initially declined to pay Danziger for its work on the Galmines matter, citing ethical concerns. Danziger filed suit, and the parties eventually settled.

requisite minimum contacts with the forum state to justify the court's jurisdiction." *Id.* "Where, as here, the court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, that burden requires only that the nonmovant make a *prima facie* showing." *Id.*

Danziger does not allege that any of the defendants are residents of Texas. "A nonresident defendant is subject to personal jurisdiction in a federal diversity suit to the extent permitted by the laws of the forum state and considerations of constitutional due process." *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, 963 F.2d 90, 93 (5th Cir. 1992). "Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis." *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018) (citation omitted). "Due process requires that the defendant have 'minimum contacts' with the forum state (*i.e.*, that the defendant has purposely availed himself of the privilege of conducting activities within the forum state) and that exercising jurisdiction is consistent with 'traditional notions of fair play and substantial justice.'" *Id.* (citation omitted). Because Danziger is "bringing multiple claims that arise out of different forum contacts of the defendant," it "must establish specific jurisdiction for each claim." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006).

III.

Danziger asserts three intentional tort claims against Morgan Verkamp: fraud, unjust enrichment, and tortious interference with prospective contractual relations. To establish personal jurisdiction in intentional tort cases, it is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff. A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates

the necessary contacts with the forum." *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (citation omitted).

## A.

The Supreme Court most recently addressed the issue of personal jurisdiction over intentional tortfeasors in *Walden v. Fiore*. That case involved a Georgia law enforcement officer who seized cash from two Nevada residents passing through Georgia and refused to return it to them for a prolonged period. 571 U.S. at 279-80. The defendant-petitioner "knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada." *Id.* at 279. Nonetheless, the Court held that the officer "lack[ed] the 'minimal contacts' with Nevada that are a prerequisite to the exercise of jurisdiction over him." *Id.* at 288 (citation omitted). After all, the Court explained, "no part of petitioner's course of conduct occurred in Nevada. Petitioner approached, questioned, and searched respondents, and seized the cash at issue, in the Atlanta airport. . . . Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 288-89. Thus, "when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—petitioner formed no jurisdictionally relevant contacts with Nevada." *Id.* at 289.

*Walden* also explained that the Court's prior decision in *Calder v. Jones* "illustrates the application of [the] principles" that govern this type of case. *Id.* at 286. In *Calder*, a California resident sued two Florida residents for libel, based on an article that they wrote and edited in Florida and published in a national magazine with a large readership in California. 465 U.S. 783, 784-86 (1984). Although they did not live in California, the *Calder* defendants nonetheless had significant contacts with the state:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered.

*Id.* at 788–89. Given "the 'effects' of [the defendants'] Florida conduct in California," the Court concluded that jurisdiction is "proper in California." *Id.* at 789.

*Walden* clarified and elaborated on *Calder*'s holding. "The crux of *Calder*," the Court explained in *Walden*, "was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Walden*, 571 U.S. at 287. Because "the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens," *id.* at 287-88, "the 'effects' caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California*, not just to a plaintiff who lived there," *id.* at 288. "That connection, combined with the various facts that gave the article a California focus, sufficed to authorize the California court's exercise of jurisdiction." *Id.* Thus, under *Calder* and *Walden*, "mere injury to a forum resident is not a sufficient connection to the forum. . . . The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290.

We applied *Walden* in *Sangha v. Navig8 ShipManagement Private Ltd.* In that case, Captain Sangha, a Texas-based seaman, lost his job at Marine Consulting and then sued Navig8, a foreign entity, for tortious interference

with a contract. 882 F.3d at 99, 102-03. Sangha argued that Texas courts had specific personal jurisdiction over Navig8, based on the following: (1) "email communications from two Navig8 representatives located outside the country to Cpt. Sangha's then-supervisor in Alabama"; (2) "an employment contract between Cpt. Sangha and Marine Consultants [sic] allegedly confected in Houston"; (3) "that the email communications [from Navig8 to Captain Sangha's former supervisor] were targeted at a contract formed in Texas"; and (4) "that the emails concerned work that was to be performed in Texas." *Id.* at 103. We held that these "contacts . . . are legally insufficient to support a finding of specific jurisdiction." *Id.* "Even though Navig8's email communications happened to affect Cpt. Sangha while he was at the Port of Houston, this single effect is not enough to confer specific jurisdiction over Navig8." *Id.* After all, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* (citing *Walden*, 571 U.S. at 290). "The proper question is not whether Cpt. Sangha experienced an injury or effect in a particular location, but whether Navig8's conduct connects it to the forum in a meaningful way." *Id.* at 103-04. And because "Cpt. Sangha's presence in the Gulf of Mexico/Port of Houston is largely a consequence of *his* relationship with the forum, and not of any actions Navig8 took to establish contacts with the forum," Sangha "failed to establish a *prima facie* case of personal jurisdiction." *Id.* at 104.

*Walden* and *Sangha* largely resolve this issue. Danziger alleges in support of its fraud and unjust enrichment claims (1) that Morgan Verkamp failed to disclose its representation of Epp when responding to an unsolicited email from Danziger about the Epp case and (2) that Morgan Verkamp continued not to disclose its representation of Epp while the two firms worked together on other cases. Danziger alleges in support of its tortious interference with prospective contractual relations claim that Morgan Verkamp emailed Epp (who is not alleged to have been in Texas) to convince

him not to formalize his relationship with Danziger. Thus, although Morgan Verkamp's allegedly tortious conduct may have *affected* Danziger in Texas, none of this conduct *occurred* in Texas. *Cf. Walden*, 571 U.S. at 288-89 ("[N]o part of [the defendant's] course of conduct occurred in Nevada. . . . Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."); *Sangha*, 882 F.3d at 103 ("Even though Navig8's email communications happened to affect Cpt. Sangha while he was at the Port of Houston, this single effect is not enough to confer specific jurisdiction over Navig8."). The only act or omission of Morgan Verkamp that is even plausibly *connected* to Texas is Morgan Verkamp's allegedly fraudulent reply to Danziger's unsolicited email about Epp, which one could characterize as having been "sent . . . to" Texas. *Walden*, 571 U.S. at 289. However, we have held that a state does not have personal jurisdiction over a non-resident who "merely answer[s] one uninitiated and unsolicited phone call." *Wilson v. Belin*, 20 F.3d 644, 649 (5th Cir. 1994). Danziger offers no reason why the same should not hold true for a defendant who merely answers one unsolicited email. Accordingly, this email does not *meaningfully* connect Morgan Verkamp to Texas. And because none of Morgan Verkamp's allegedly tortious conduct meaningfully connects it to Texas, Texas courts do not have jurisdiction over Danziger's intentional tort claims against Morgan Verkamp. *See Walden*, 571 U.S. at 290 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

## B.

Danziger does not cite *Walden* or *Sangha* in its opening brief. Instead, Danziger primarily relies on our decisions in *Wien Air Alaska, Inc. v. Brandt* and *Trois v. Apple Tree Auction Center, Inc.* In *Wien Air*, a Texas-based airline sued a German resident for fraud. 195 F.3d 208, 209, 211 (5th Cir. 1999). The

defendant had "performed several tortious actions outside of Texas" that "had foreseeable effects in the forum and were directed at the forum. These contacts take the form of letters, faxes, and phone calls to Texas . . . whose contents contained fraudulent misrepresentations and promises and whose contents failed to disclose material information." *Id.* at 212. Though the defendant argued that "communications directed into a forum standing alone are insufficient to support a finding of minimum contacts," we held that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment. The defendant is purposefully availing himself of 'the privilege of causing a consequence' in Texas." *Id.* at 213. Similarly, in *Trois*, the defendant had "participated in a conference call [with a Texas resident] . . . and allegedly misrepresented certain things over the phone." 882 F.3d 485, 490-91 (5th Cir. 2018). Although the defendant "did not initiate the conference call to Trois in Texas," "he was the key negotiating party who made representations regarding his business in a call to Texas." *Id.* at 491. Since "that intentional conduct . . . led to this litigation," we held that the defendant "should have reasonably anticipated being haled into Texas court." *Id.*

This case is very different from both *Wien Air* and *Trois*. In *Wien Air*, "numerous calls, letters and faxes were made by [the defendant] to Wien Air in Texas, and . . . these calls contained the promises, assurances, and representations that are at the heart of the lawsuit." 195 F.3d at 212. And in *Trois*, the defendant was "a willing participant on a conference call [with a Texas resident] who actively engaged in conversation regarding his business," making him "akin to an initiator of a phone call as contrasted to the recipient of an uninitiated, unsolicited phone call." 882 F.3d at 491. Here, by contrast, Morgan Verkamp is not alleged to have either initiated or "actively engaged" in a single communication directed into Texas, let alone

"numerous" ones. As explained above, its only action that was even plausibly directed into Texas was a reply to an unsolicited email, which is not a sufficient contact for jurisdiction under our precedents. *See Wilson*, 20 F.3d at 649. Because Morgan Verkamp's alleged contacts with Texas were significantly less numerous and less purposeful than those of the defendants in *Wien Air* and *Trois*, neither of those decisions controls this case. *See Miss. Interstate Express, Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1006 (5th Cir. 1982) ("[W]hether the minimum contacts are sufficient to justify subjection of the non-resident to suit in the forum is determined . . . under the particular facts upon the quality and nature of the activity with relation to the forum state.").

The other decisions that Danziger cites also prove unavailing. In support of its argument that Texas courts have personal jurisdiction over its fraud and unjust enrichment claims, Danziger cites *Streber v. Hunter* and *Walk Haydel & Associates, Inc. v. Coastal Power Production Co.* We did note in *Streber* that an attorney's "failure to disclose material information from Louisiana to [a client] in Texas also forms a basis for personal jurisdiction." 221 F.3d 701, 718 n.25 (5th Cir. 2000). However, we did not say that a state has personal jurisdiction over every non-resident that fails to disclose material information to a resident; rather, we emphasized that the case involved a lawyer who "continually communicated with" his "client in another forum." *Id.* (citation omitted). Moreover, numerous other contacts supported Texas's jurisdiction in that case—the Louisiana lawyer had given "tax advice that he knew would be received by a Texas client" and had allegedly committed "malpractice . . . during [a] 1993 mediation, which took place in Houston." *Id.* at 718. Similarly, in *Walk Haydel*, we held that Louisiana courts had personal jurisdiction over an Illinois law firm that had failed to disclose a conflict of interest to its Louisiana client in not only "over a hundred . . . telephone calls, faxes, and letters" that it had sent to its client in Louisiana but also a meeting that had occurred in Louisiana. 517 F.3d 235,

237, 243-45 (5th Cir. 2008). As with *Wien Air* and *Trois*, *Streber* and *Walk Haydel* involve contacts that are significantly more numerous and more purposeful than the contacts alleged in this case.

Danziger further argues that *Central Freight Lines Inc. v. APA Transportation Corp.* and *Access Telecom, Inc. v. MCI Telecommunications Corp.* show that Texas courts have personal jurisdiction over its tortious interference with prospective contractual relations claim. In *Central Freight*, a New Jersey-based freight carrier allegedly interfered with a contract between the plaintiff, a Texas-based freight carrier, and Dell Computers, a Texas-based computer manufacturer. 322 F.3d 376, 379, 384 (5th Cir. 2003). Emphasizing that "Texas is not only [the plaintiff's] home state; it is also the primary location of [its] business relationship with Dell Computers," we held that "it is not unreasonable for [the non-resident defendant] to be haled into court in the Western District of Texas for alleged intentional interference with the contractual relationship of two Texas-based companies whose business dealings are based in Texas." *Id.* at 384. Here, Epp is not alleged to have been a Texas resident, and though Danziger argues that Morgan Verkamp knew that Danziger would have represented Epp out of its Houston office, a Texas law firm's representation of a non-Texas person in a non-Texas matter is not "based in Texas" in the same way that a relationship between a Texas manufacturer and a Texas shipper is "based in Texas."

In *Access Telecom*, a foreign telephone company allegedly "violated U.S. antitrust law by harming a Texas business through the willful cancellation of a necessary portion of that business's service." 197 F.3d 694, 701, 719 (5th Cir. 1999). The foreign telephone company's "lines ran right up and into Texas for the express purpose of serving Texas residents with Mexican phone service, a service [for] which it received millions of dollars a month in revenue," and we held that the "allegation that [the foreign company] shut down these lines in order to harm a Texas business whose

services were legal in Mexico suffices to confer personal jurisdiction over [the foreign company] for the injuries suffered in Texas." *Id.* at 719. Once again, the non-resident defendant's forum contacts in *Access Telecom* are significantly more numerous and significantly more purposeful than Morgan Verkamp's contacts with Texas in this case.

\*    \*    \*

Under *Walden* and *Sangha*, Texas courts do not have personal jurisdiction over Danziger's intentional tort claims. The cases that Danziger relies on do not provide reason to think otherwise. Because none of Morgan Verkamp's allegedly tortious conduct either occurred in Texas or was otherwise meaningfully connected to the state, the district court correctly dismissed Danziger's intentional tort claims for lack of personal jurisdiction.

## IV.

Danziger also asserts a claim against Morgan Verkamp for breach of contract. When determining whether a court has personal jurisdiction over a breach of contract claim, "only those acts which relate to the formation of the contract and the subsequent breach are relevant," including "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018) (citations omitted). Importantly, "merely contracting with a resident of the forum state does not establish minimum contacts." *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007). Further, "a plaintiff's unilateral activities in Texas do not constitute minimum contacts where the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract is centered outside of Texas." *Id.* at 312. "An exchange of communications in the course of developing and

carrying out a contract also does not, by itself, constitute the required purposeful availment of the benefits and protections of Texas law." *Id.*

Danziger relies primarily on our decision in *Central Freight*. That case involved not only the contractual interference claim described above but also a breach of contract claim, both brought by a Texas-based freight carrier against a New Jersey-based carrier in a Texas court. 322 F.3d at 379. On appeal, we explained that because "all of the formal negotiations took place via telephone and written correspondence between the two parties from their respective headquarters," the New Jersey carrier could "not really dispute the fact that, during the course of negotiations, [it] specifically and deliberately 'reached out' to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual relationship with a Texas corporation." *Id.* at 382. Moreover, the New Jersey carrier "knew that it was affiliating itself with an enterprise based primarily in Texas" and "presumably knew that many of [the Texas carrier's] customers would . . . come from that state." *Id.* Because the New Jersey carrier thus "purposefully directed its in-state and out-of-state activities at a resident of the forum . . . with the aim of establishing a long-term association with that resident and with the foreseeable and intended result of causing economic activity within the forum state," we held that the carrier "should have reasonably anticipated being haled into court in Texas on breach of contract claims related to that [contract], notwithstanding [its] relatively brief *physical* presence in the state." *Id.* at 383.

Danziger also cites *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.* In that case, "the actual course of dealing between [the plaintiff] and [the defendant] involved wide reaching contacts and contemplated future consequences within the forum state." 176 F.3d 867, 872 (5th Cir. 1999). Specifically, the defendant "was attempting to acquire technology from [the plaintiff] in Texas for the establishment of manufacturing centers in India."

*Id.* As part of their agreement, the plaintiff "contracted to train [the defendant's] employees, aid in designing [the defendant's] manufacturing facilities, provide technical support and regulate quality control of [the defendant's] products." *Id.* The parties "planned to participate in each of these functions either wholly or in substantial part in Texas." *Id.* We ultimately concluded that the defendant had "engaged in such 'continuing and wide-reaching contacts' with [the plaintiff] in Texas, and committed itself to such future contacts in the forum, that it should reasonably have anticipated being haled into court there." *Id.*

Morgan Verkamp calls our attention to several cases in response. In *Trois*, we concluded that because the "contract was executed and performed solely in Ohio" and the "only alleged Texas contacts related to contract formation or breach are [the defendant's] conference calls negotiating the agreement while [the plaintiff] was in Texas," Texas courts did "not have personal jurisdiction over the defendants regarding the breach-of-contract claim." 882 F.3d at 489. Similarly, in *Moncrief Oil*, a dispute involving several contracts that "were executed in Russia, with a Russian corporation, concerning a Russian joint venture, to develop a Russian gas field," we rejected the argument that states have personal jurisdiction over "breach of contract case[s] where a nonresident enters into a contract with a known resident of the forum state, if it is reasonably foreseeable that the resident will perform a material part of its obligations in the forum state and thereby cause business activity in the forum state." 481 F.3d at 312. We explained that the plaintiff, a Texas resident, had simply "agreed to perform analysis, without any discussion of *where* it would be done. The contract was silent as to location." *Id.* at 313. Moreover, "[g]iven the nature of the work, there's no indication that the location of the performance mattered." *Id. Moncrief Oil* also distinguished *Central Freight*, explaining that the contract in that case had "contemplated that the plaintiff would make shipments from Texas on

behalf of third-party Texas customers. The plaintiff's Texas location was strategically advantageous to the defendant and was the basis for the agreement, suggesting that the defendant had purposefully availed itself of doing business in Texas." *Id.* (citation omitted).

Finally, *Holt Oil & Gas Corp. v. Harvey* featured an Oklahoma defendant that had "entered into a contract with . . . a Texas corporation"; "sent a final revised joint operating agreement from Oklahoma to Texas"; "sent three checks from Oklahoma to Texas in partial performance of its contractual obligations"; and "engaged in extensive telephonic and written communication with [the Texas corporation]." 801 F.2d 773, 776, 778 (5th Cir. 1986). We concluded that these contacts were insufficient for Texas to exercise personal jurisdiction over the defendant. *Id.* at 778. As we observed, "Oklahoma law would govern the agreement," and "the material performance occurred in Oklahoma." *Id.* Additionally, we determined that "the exchange of communications between Texas and Oklahoma in the course of developing and carrying out the contract was . . . insufficient to constitute purposeful availment of the benefits and protections of Texas law." *Id.* After all, "[t]hese communications to Texas rested on nothing but 'the mere fortuity that [Holt] happens to be a resident of the forum.'" *Id.* (second alteration in original).

This dispute is closer to *Trois*, *Moncrief Oil*, and *Holt Oil*, the cases in which the forum state did not have jurisdiction, than it is to *Central Freight* and *Electrosource*, in which the forum state had jurisdiction. Danziger alleges in support of its breach of contract claim that: (1) Epp reached out to Danziger about a potential *qui tam* matter; (2) Danziger arranged two conference calls between itself, Morgan Verkamp, and Epp; (3) Danziger and Morgan Verkamp agreed telephonically to split any fees they received from their work on the Epp matter; (4) the parties exchanged several emails with each other and Epp regarding their potential representation of Epp; and (5)

No. 21-20186

Morgan Verkamp ultimately represented Epp in a Pennsylvania lawsuit but refused to split the fees that it received from the case.[4] Thus, unlike *Electrosource*, this case does not involve "wide reaching contacts and contemplated future consequences within the forum state." 176 F.3d at 872. And unlike *Central Freight*, "[t]he plaintiff's Texas location" was not "strategically advantageous to the defendant . . . , suggesting that the defendant had purposefully availed itself of doing business in Texas." *Moncrief Oil*, 481 F.3d at 313 (describing the decision in *Central Freight*). Rather, as in *Trois*, "[t]he only alleged Texas contacts related to contract formation or breach are [the defendant's] conference calls negotiating the agreement while [the plaintiff] was in Texas." 882 F.3d at 489; *see also McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) ("[C]ommunications relating to the performance of a contract themselves are insufficient to establish minimum contacts."). And like *Holt Oil*, the defendant's "communications to Texas rested on nothing but 'the mere fortuity that [the plaintiff] happens to be a resident of the forum.'" 801 F.2d at 778 (citation omitted). As we held in *Moncrief Oil*, "mere fortuity that one company happens to be a Texas resident . . . is not enough to confer jurisdiction." 481 F.3d at 313.[5]

---

[4] Notably, Danziger does not allege that the agreement required it to perform any work. Indeed, Danziger is currently seeking to recover for breach of this contract even though it does not allege that it performed any legal work for Epp, in Texas or otherwise.

[5] Danziger also points out that the alleged contract did not have a choice-of-law provision. However, the absence of a choice-of-law provision has no impact on our jurisdictional analysis in this case. While a choice-of-law provision specifying a non-Texas forum might indicate that Texas courts do not have personal jurisdiction over the defendant, *see Holt Oil*, 801 F.2d at 778; *Moncrief Oil*, 481 F.3d at 313, we have explained that a contract's lack of a choice-of-law clause gives the defendant neither "specific notice that it might be amenable to suit in Texas" nor "reason to think that it could not be haled into court in Texas." *Cent. Freight Lines Inc.*, 322 F.3d at 383 (emphasis omitted).

Danziger was the only connection between the alleged contract and Texas. Morgan Verkamp did not perform in Texas and was not required to perform in Texas. Moreover, this alleged contract to split the fees arising from a non-Texas law firm's legal representation of a non-Texas client in a non-Texas case was centered outside of Texas. As previously stated, "a plaintiff's unilateral activities in Texas do not constitute minimum contacts where the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract is centered outside of Texas." *Moncrief Oil*, 481 F.3d at 312. Accordingly, the district court correctly dismissed Danziger's breach of contract claims for lack of personal jurisdiction.

## V.

For the foregoing reasons, we AFFIRM the district court's order granting Morgan Verkamp's motion to dismiss Danziger's complaint for lack of personal jurisdiction.